No. 3--08--0442

_____

Filed November 5, 2008

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2008

| | |
|---|---|
| In re D.D., JR.; S.D.; and C.D.,) | Appeal from the Circuit Court |
| ) | of the 9th Judicial Circuit, |
|     Minors                       ) | Hancock County, Illinois, |
| ) | |
| (The People of the State of  ) | |
| Illinois,                      ) | |
| ) | |
|     Petitioner-Appellee,    ) | No. 03--JA--4 |
| ) | |
|     v.                     ) | |
| ) | |
| D.D., Sr., and A.D.,       ) | Honorable |
| ) | Patricia A. Walton, |
|     Respondents-Appellants).  ) | Judge, Presiding. |

_____

JUSTICE LYTTON delivered the Opinion of the court:

_____


Respondent D.D., Sr., is the father of the minors at issue in this case, and respondent A.D. is the mother. The trial court found both respondents unfit to care for their minor children and terminated their parental rights. The minors met the definition of "Indian Child[ren]" under the federal Indian Child Welfare Act (ICWA); thus, the ICWA governed this case. On appeal, the respondents argue that the State did not meet its burden under sections §1912(d) and (f) of the ICWA (25 U.S.C.A. 1912(d), (f) (West 2001)), and that the mother's trial counsel provided

ineffective assistance.  We affirm.

FACTS

On October 29, 2003, the State filed a juvenile petition alleging that D.D., Jr. (D.D.), born June 6, 1997; S.D., born July 31, 1999; and C.D., born November 20, 2002, were neglected. Specifically, the petition alleged that the minors were subjected to an injurious environment because: (1) they were "filthy"; (2) C.D. consumed Pepsi from a bottle with old formula stuck to the inside of the bottle; and (3) D.D. and S.D. were scarred from a candle they played with while the respondents slept.  The petition further alleged that the minors were abused and at substantial risk of physical harm because, among other reasons, the father threw a coffee mug at D.D. that hit him in the face.  The court held a shelter care hearing that day and placed temporary custody of the minors with the Department of Children and Family Services (DCFS). Since the minors met the definition of "Indian Child[ren]" under the ICWA (25 U.S.C.A. §1911(b) (West 2001)), the Cherokee Nation filed a notice of intervention pursuant to section 1911(c) of that act (25 U.S.C.A. §1911(c) (West 2001)).  Howard Paden, a representative of the Cherokee Nation, indicated that the Cherokee Tribe would not seek to remove the children from their non-Indian foster placement, but he would monitor the progress of the respondents and minors.

A family service provider filed a social history report in

2

October 2003. She reported that the respondents' household functioned in "total chaos"; the respondents did not possess "any parenting skills"; and the minors would not "have the opportunity to function in a normal environment as long as [they were] subjected to the verbal abuse" of the respondents. Jerri Niewohner, a DCFS caseworker, also noted that the respondents did not understand the harm they were causing the minors by physical and verbal abuse or why the instant juvenile case was opened.

On February 25, 2004, the respondents admitted the allegations of neglect in the juvenile petition, and the father also admitted to abuse by throwing a coffee mug at D.D.'s face. At the March 24, 2004, dispositional hearing, the court found that the minors were neglected and abused, made them wards of the court, and granted guardianship to DCFS. The court ordered the respondents to complete their client service plan tasks.

Niewohner filed a client service plan that included the following tasks: (1) attend parenting classes to learn to discipline the minors without corporal punishment, to interact with the minors in a nurturing way, and to understand D.D.'s special needs of attention deficit hyperactivity disorder and posttraumatic stress disorder; (2) learn budgeting and homemaking skills, including appropriate hygiene and nutrition for the minors and creating a nonhazardous home environment; (3) individual therapy for each respondent, including mental health treatment for the

3

mother and anger management and domestic violence classes for the father; (4) visit the minors; and (5) implement what they learned. Additionally, D.D. and the respondents also received instruction from Screening Assessment and Support Services (SASS) and Chaddock theraplay to learn how to interact with each other, given D.D.'s special needs. The respondents also received psychiatric therapy with Dr. Michael Schneider starting in 2006.

By February 3, 2005, the respondents had made sufficient progress on their tasks to have the minors returned home. To assist with this adjustment, Addus Health Care provided in-home homemaking services five days per week. On the other two days per week, a DCFS worker provided in-home assistance. However, on September 20, 2005, the minors were placed back into foster care because the respondents could not control the childrens' behavior, and D.D.'s psychiatrist believed he would be in "grave danger" were he to return to the respondents' home.

On May 31, 2007, the State filed a petition to terminate the respondents' parental rights. The State alleged that the respondents were unfit parents because, among other allegations, they failed to make: (1) reasonable efforts to correct the conditions that were the basis for removal of the minors (750 ILCS 50/1(D)(m)(i) (West 2002)); and (2) reasonable progress toward the return home of the minors during any nine month period after the adjudication of neglect and abuse (750 ILCS 50/1(D)(m)(iii) (West

4

2002)).

The court conducted fitness hearings from August 1 to October 31, 2007. Schneider testified as an expert in psychology. He had provided family therapy for the respondents since February 2006. In his opinion, the respondents showed the "potential for being able to provide at least minimally adequate parenting skills for [S.D. and C.D.] in the presence of an adequate support network." Schneider felt that the respondents had made slow but steady progress on improving their parenting skills through counseling. However, he did not believe they had progressed to a point where they could benefit from specialized training to parent a child with D.D.'s special needs. Schneider felt that when the respondents were not rewarded for their progress, such as through additional visitation, they would become frustrated and less engaged. Schneider testified that he viewed the case through the eyes of the respondents, not in the best interest of the minors.

Martha Butler provided parenting classes to the respondents. She testified that the respondents had completed a parenting course. However, because Butler felt the respondents needed additional instruction, she had provided in-home training, which was not "customary[.]" Overall, Butler felt that the respondents had made some efforts, but they had struggled to implement the techniques they had learned, and they needed to continue working on most areas of parenting.

5

Butler, as well as family support specialists Sheryl Hopping and Fran Estes, attended visits between the respondents and the minors. Both Hopping and Estes observed the children were left unsupervised and without life jackets while playing near a lake. Both also observed inconsistent parenting techniques and a failure to implement what they were taught in parenting classes. For example, the respondents continued to scream at the minors instead of using consequences or "time-out" as a form of discipline. Estes observed the father strike his youngest daughter, A.D., in a struggle over juice.[1] Butler, Hopping and Estes each opined that the respondents were unwilling to accept constructive criticism regarding their parenting techniques.

Lisa Abbey was a family services coordinator at The Baby Fold, where D.D. currently resided and was receiving treatment. She testified that she supervised visits between the respondents and D.D. She believed the respondents needed to master basic parenting skills before learning to parent D.D.'s special needs. She expressed concern that the respondents were loud and displayed anger towards A.D.

Dr. Robert Lusk, the clinical director of The Baby Fold, testified as an expert in clinical psychology. His testimony centered on D.D.'s progress. He believed that D.D. had progressed on reducing his anger and improving his social skills.

---

[1] A.D. is not involved in this case.

Niewohner, the DCFS caseworker assigned to this case from September 2003 until August 2006, also testified. She acknowledged that the minors were returned home to the respondents in January 2005, and that the respondents improved on their parenting skills while under the in-home monitoring of Addus and DCFS. However, the respondents regressed on their parenting skills once the in-home assistance was reduced. The respondents also unilaterally discontinued some services, including family therapy and Chaddock theraplay. In a report dated June 2006, Niewohner believed that the respondents were not capable of providing nurturing care and management of the minors on a full-time basis.

Tricia Boughton, the caseworker from July 2006 until the time of the hearing, testified she was concerned because the respondents had not addressed the issues that initiated the opening of the case, especially failing to take responsibility for the verbal and physical abuse they inflicted on the minors. In a client service plan she filed in April 2007, Boughton stated that "without [the respondents'] ability to address this [abuse], *** thier (sic) children will be at further risk of harm." She was also concerned that the father did not believe D.D. had special needs.

Because the respondents were not consistently performing their service plan tasks or implementing what they had learned, Boughton rated their overall progress on each service plan from September 2005 to the present as unsatisfactory. In the April 2007 service

7

plan, Boughton specifically addressed the respondents' progress regarding discipline and nurturing of the minors. She noted that further abuse could occur "without the [respondents'] ability to acknowledge the [physical] abuse as well as thier (sic) ability to be realistic regarding the significant needs of [D.D.]"

Boughton also testified that the respondents were sometimes hostile towards her. During a visit in April 2007, she recommended to the respondents that they watch videos with the minors only once per month. The respondents disagreed and yelled at Boughton, causing A.D. to cry and hide beneath a blanket.

The trial court found that the State had proven, beyond a reasonable doubt, that the respondents were unfit for failing to make: (1) reasonable efforts to correct the conditions that were the basis for removal of the minors (750 ILCS 50/1(D)(m)(i) (West 2002)); and (2) reasonable progress toward the return home of the minors during any nine month period after the adjudication of neglect and abuse (750 ILCS 50/1(D)(m)(iii) (West 2002)).

After the fitness hearing, the mother's trial counsel sent her a letter that alleged she had not been truthful with him and offered a critical opinion of the respondents' efforts on their service plan tasks and their parenting skills. The mother sent this letter to the court. The court appointed different counsel to represent the mother for the best interest hearing.

At the best interest hearing, Brian Joe, a representative of

8

the Cherokee Tribe, was qualified as an expert in the Cherokee Tribe. Although Joe was a member of the Navajo Tribe, he had completed 40 hours of coursework on the history of the Cherokee Nation, possessed a bachelor's degree, and was currently working towards a master's degree. He attended courses conducted by the Cherokee Nation on the ICWA, and also participated in Cherokee powwows and holidays. According to Joe, a Cherokee Indian's family is to be held in "high importance" to them, and "children are [their] main concern." Joe testified that he and Paden had worked with DCFS to monitor the case for the Cherokee Tribe. Specifically, they ensured that the court and DCFS complied with the mandates of the ICWA.

According to Joe, DCFS met the requirement of using "active efforts" in providing services to keep the family intact, although these services had ultimately been unsuccessful. 25 U.S.C.A. §1912(d) (West 2001). Joe noted that DCFS had provided "quite a few services" since the opening of the case in 2003. Joe believed that the respondents would not have benefited from courses regarding D.D.'s special needs because they did not accept that D.D. had special needs and had not mastered basic parenting skills. Joe further testified that he had reviewed the reports of the other service providers in the case. He said that the respondents "weren't able to take what resources they had been given *** and *** apply more positive parenting style for the children." Thus,

9

the Cherokee Tribe did not oppose termination of the respondents' parental rights.

The court found that it was in the best interest of the minors to terminate the respondents' parental rights. The court based this finding on: (1) the respondents' lack of progress on their tasks; (2) S.D. and C.D.'s bond with their foster parents, whom they had resided with since the outset of the case, and the foster parents' desire to adopt them; and (3) the minors' need for permanence and stability. The court also specifically found that the return home of the children would likely result in potential serious emotional or physical harm to them, as stated in section 1912(f) of the ICWA. 25 U.S.C.A. §1912(f) (West 2001).

## ANALYSIS

### I. Expert Testimony

The respondents first contend that the State failed to meet the requirements of section 1912(f) of the ICWA because no qualified expert witness testified that continued custody by the parents was likely to result in serious emotional or physical damage to the children. They also assert that the trial court failed to determine whether custody by the parents was likely to result in serious emotional or physical damage to the children.

### A. ICWA

The ICWA was enacted by Congress in response to the "growing concern over the consequences to Indian children, families and

tribes of abusive welfare practices which separated large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes."  In re C.N., 196 Ill. 2d 181, 203, 752 N.E.2d 1030, 1043 (2001), citing Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 104 L. Ed. 2d 29, 109 S. Ct. 1597 (1989).

The ICWA articulates the minimum federal standards for the removal of an Indian child from his or her family.  25 U.S.C.A. §1902 (West 2001); C.N., 196 Ill. 2d 181, 752 N.E.2d 1030. Pursuant to section 1912(f), no termination of parental rights may be ordered in the absence of a finding, beyond a reasonable doubt and supported by the testimony of "qualified expert witnesses," that the continued custody of the children by their parents is likely to result in serious emotional or physical damage to them. 25 U.S.C.A. §1912(f) (West 2001).

## B. Expert Witness Testimony

The ICWA does not define "qualified expert witness."  However, the Bureau of Indian Affairs has issued nonbinding guidelines to assist state courts in their application of the ICWA.  44 Fed. Reg. 67,584 (1979); see C.N., 196 Ill. 2d 181, 752 N.E.2d 1030.  Under those guidelines, an expert witness may be: (1) a member of the Indian child's tribe who is recognized by the tribe as possessing knowledge of tribal customs as they pertain to family structure and child rearing; (2) a lay witness having substantial experience in

the delivery of child and family services to Indians, and extensive knowledge of prevailing cultural and social customs of the Indian child's tribe; or (3) professionals who have substantial education in their area of specialty.  44 Fed. Reg. at 67,593, pars. D.4(b)(i) through (iii) (1979).

The commentary to the guidelines provide that the expert should determine: (1) whether the parents' conduct will cause serious physical or emotional harm to the child; and (2) if the parent can be persuaded to change the damaging conduct.  44 Fed. Reg. at 67,593, par. D.4 (1979).  Courts have considered the testimony of an expert witness, in conjunction with the testimony of lay witnesses, sufficient to meet section 1912(f) of the ICWA. See In re Kreft, 148 Mich. App. 682, 384 N.W.2d 843 (1986).

In this case, Joe testified that he had substantial practical knowledge and education regarding the Cherokee Tribe.  Thus, he met the "qualified expert witness[]" requirement of section 1912(f). 25 U.S.C.A. §1912(f) (West 2001).

Joe stated that he performed an independent review of the case by reading reports filed by the other caseworkers and speaking with them.  In his opinion, the respondents did not implement the skills they were taught to apply a more positive parenting style for the children and had not achieved basic parenting skills.  Other service providers agreed that the respondents had not achieved basic parenting skills and had not accepted the reasons why the

instant juvenile case was opened.  Further, Boughton noted that because the respondents were unwilling to acknowledge the past physical and verbal abuse they inflicted on the minors, the minors would "be at further risk of harm."  Thus, Joe's testimony, in conjunction with the testimony of the other caseworkers, sufficiently met the requirements of section 1912(f) that the record show that continued custody of the children by the parents was likely to result in serious emotional or physical harm.

## C. Trial Court Finding

The respondents also allege that the court did not determine that continued custody of the children by the respondents would likely result in serious emotional or physical damage to the minors.  However, in the order providing for the termination of the respondents' parental rights, the court found that "the return of the children to the parents is likely to result in potential serious emotional or physical damage to the children; therefore, a termination of parental rights is warranted."  Thus, we find the court complied with the requirements of section 1912(f) of the ICWA.

## II. Active Efforts

Next, the respondents contend that the State failed to prove that active efforts were made to prevent the breakup of their family.

Section 1912(d) of the ICWA provides that in a termination

13

proceeding, the party "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and those efforts have proved unsuccessful." 25 U.S.C.A. §1912(d) (West 2001). The State has the burden to show compliance with the active efforts requirement by a preponderance of the evidence. In re Cari B., 327 Ill. App. 3d 743, 763 N.E.2d 917 (2002).

The record supports the court's determination that the State met its burden of establishing active efforts by a preponderance of the evidence. DCFS offered a number of services to the respondents, including extensive homemaking services, mental health counseling, and classes in parenting, anger management, and domestic violence. The evidence indicates, however, that the respondents failed to learn from the programs.

Although the respondents argue that "DCFS provided no services or assistance to the [respondents] for their special needs children," the record shows that these services were offered through SASS and Chaddock theraplay. The father refused to recognize D.D.'s special needs. Also, Schneider testified that because the respondents had not been consistent in implementing basic parenting skills, further services, such as those concerning D.D.'s special needs, could not be offered.

Thus, the record supports the trial court's holding that the State met its burden under section 1912(d) of the ICWA and

14

established active efforts by a preponderance of the evidence.

Still, the record does not show the counsel's representation of the mother fell below an objective standard of reasonableness.

CONCLUSION

The judgment of the circuit court of Hancock County is affirmed.

Affirmed.

O'BRIEN and WRIGHT, JJ., concurring.