*In re* CARI B. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. James B., Respondent-Appellant).

Second District No. 2—01—0842

Opinion filed February 1, 2002.

744

Donald P. Sullivan, of Rockford, for appellant.

Paul A. Logli, State's Attorney, of Rockford (Martin P. Moltz and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE HUTCHINSON delivered the opinion of the court:

Following a bench trial, the trial court terminated the parental rights of respondent, James B., the father of Cari B., Anastasia B., A.B., and Jacob B. The trial court also terminated the parental rights of the minors' mother, Lisa C. Lisa C. is not a party to this appeal. On appeal, respondent raises a single contention—whether the State complied with the "active efforts" requirement of the Indian Child Welfare Act of 1978 (the ICWA) (25 U.S.C.A. § 1912(d) (West 2001)). We affirm.

On August 28, 1996, the State filed petitions alleging the minors were neglected, *inter alia*, because their environment was injurious to their welfare after respondent stabbed their mother, Lisa C., while the children were present in the home. On October 24, 1996, the trial court adjudicated the minors neglected. On July 9, 1999, the State filed petitions for the termination of parental rights, alleging in three counts that respondent was unfit because (1) he abandoned the minors (750 ILCS 50/1(D)(a) (West 1998)), (2) he failed to maintain a reasonable degree of interest in the minors (750 ILCS 50/1(D)(b) (West 1998)), and (3) he substantially neglected the minors (750 ILCS 50/1(D)(d) (West 1998)). On September 9, 1999, the State filed an amended petition in Anastasia's case, adding allegations of unfitness against another man, Mark S., as the putative father. The State did not amend the allegations of unfitness against respondent. On June 28, 2001, the trial court terminated respondent's parental rights based on a finding of unfitness on the second count, *i.e.*, that he failed to maintain a reasonable degree of interest.

■ Because respondent has raised no issue on appeal related to the trial court's substantive ruling on the termination petition, we have

summarized only those facts relevant to his active efforts contention. The issues raised in this appeal are highlighted when the relevant facts are considered in light of the procedural requirements of the ICWA. Section 1912 of the ICWA provides in part:

"(d) Remedial services and rehabilitative programs; preventive measures

Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

\*\*\*

(f) Parental rights termination orders; evidence; determination of damage to child

No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C.A. §§ 1912(d), (f) (West 2001).

In June 1997 the Department of Children and Family Services (DCFS) referred the minor's case to a caseworker at Family Advocate, a social service agency. On July 15, 1997, Family Advocate submitted a report to the trial court indicating that it had received information that the Oneida Indian Tribe (Oneida tribe) might have an interest in the case. In response, the trial court ordered DCFS to contact the Oneida tribe. On October 8, 1997, the Oneida tribe sent a letter to the trial court indicating that respondent was enrolled in the tribe and the minors were eligible for enrollment in the tribe. The Oneida tribe asserted that as a result the minors were "Indian children" within the meaning of the ICWA and indicated its intent to intervene. On July 8, 1999, the Oneida tribe sent a letter to the trial court indicating that it had not been given formal notice of the pending termination proceedings. On July 9, 1999, the trial court ordered the State to provide notice to the Oneida tribe. On October 22, 1999, the trial court granted the Oneida tribe leave to intervene and granted the tribe's attorney's motion for admission *pro hac vice*. The Oneida tribe indicated that it would not take a position on the termination proceedings at that time because it had insufficient information.

The trial court commenced the fitness hearing on July 31, 2000. Respondent's attorney objected and moved for a continuance. Respondent's attorney alleged that respondent was incarcerated in

Missouri and was unavailable for trial. The trial court held that respondent was unavailable through his own fault and denied the motion for a continuance.

Lisa C. testified that respondent was the father of the minors. Lisa testified that her relationship with respondent was volatile and that he stabbed her in the shoulder with a knife in 1996. Lisa testified that all four minors were present and that she was holding Anastasia in her arms when respondent stabbed her.

The trial court continued the hearing until November 9, 2000. On that day, respondent's attorney informed the trial court that respondent was still incarcerated in Missouri, renewed his objection to proceeding in respondent's absence, and moved to continue the matter. The trial court denied respondent's motion for a continuance.

Christine Johnson (Johnson) testified that she was previously employed as a caseworker by Family Advocate. DCFS referred the minors' case to Family Advocate in 1997. Johnson was their caseworker from June 1997 until August 2000. Johnson testified that respondent was in prison in Missouri during that period. Johnson also testified that she was contacted by respondent by telephone the day before Thanksgiving in 1997. Respondent indicated that he wanted to visit the minors. Johnson scheduled a meeting with respondent for December 4, 1997.

Johnson further testified that she contacted the state of Missouri before the meeting and learned that respondent had left a halfway house in Missouri. Johnson contacted the police, and they arrested respondent when he arrived at Johnson's office. Johnson did not meet respondent personally on any other occasion. Johnson testified that she received correspondence from respondent addressed to her or to the minor children. Johnson testified that respondent was not otherwise participating in programs provided by Family Advocate.

On cross-examination by respondent's attorney, Johnson admitted that her only meeting with respondent was the one at which he was arrested. Johnson testified that after that meeting respondent was extradited to Missouri. Johnson testified that respondent corresponded with her from prison in Missouri. Johnson testified that she occasionally wrote to respondent and always sent him copies of the case plans. Johnson admitted that the case plans were on preprinted forms and that she never summarized the requirements of the case plans in the form of a letter to respondent. Johnson admitted that she never sent respondent correspondence in simple language, such as "this is what you need to do to retain your parental rights."

On further cross-examination, Johnson testified that she contacted the Missouri Department of Corrections (the Missouri DOC) and

learned that they offered various services in their correctional facilities. However, Johnson "did not get very far with information because [respondent] would not sign releases." Johnson testified that the case plans she sent respondent outlined the programs in which respondent should participate. However, Johnson admitted that she did not recall ever sending respondent correspondence in the form of "this is what you need to do as far as programs that are offered in Missouri DOC."

On further cross-examination, Johnson admitted receiving a letter from respondent in February 1999 and identified a copy of the letter. Johnson also identified letters she received from respondent in July 1999 and January 2000. Johnson admitted that in the letters respondent "expressed an interest" in the minors. Johnson admitted that respondent had sent other letters but she did not recall him sending many letters or the contents of those letters. Johnson testified that respondent also sent letters to the minors in care of her. Johnson testified that she exchanged information regarding the case with Sharon Skenandore, a social worker with the Oneida tribe. Johnson admitted seeing a copy of an undated letter sent to Skenandore in which respondent wrote, "I have completed an anger management class, substance abuse class. Would there be any other classes that I can take in helping me get my kids back once I get out in 18 months?" Johnson testified that respondent had a copy of the case plan that outlined what he needed to do but admitted that she never wrote to respondent in response to that letter. Johnson testified that she was not aware of the nature of the services respondent received from the Missouri DOC because he never signed a release allowing Family Advocate access to that information.

Respondent's attorney indicated that respondent was unavailable to testify but asked to admit the letters that Johnson identified. The letters were admitted into evidence without objection.

On December 4, 2000, the trial court determined that respondent was unfit because he failed to maintain a reasonable degree of interest, concern, or responsibility regarding the minors' welfare. The State raised the issue of the burden of proof under the ICWA and asked the trial court for clarification. In response, the trial court indicated that, in accordance with the ICWA, it applied the "beyond a reasonable doubt" standard to its findings regarding respondent.

On February 7, 2001, the trial court conducted a best interests hearing. Ann Johnson (Ann), a supervisor at Family Advocate, testified and described the minors' foster home placement. On cross-examination by respondent's attorney, Ann admitted that she had not made any efforts to contact respondent herself. Ann testified that respondent was provided with copies of the service plans. Ann testified

that she did not contact Missouri DOC herself to determine what services were available for respondent and could not recall whether someone else contacted Missouri DOC. Ann testified that the caseworker sent respondent copies of the case plans. Ann further testified that she did not recall whether the caseworker included a cover letter with the case plan explaining the actions expected of respondent. Ann admitted that it was possible that respondent received the case plans but did not understand how to satisfy the goals contained in the plans. Lisa C. also testified on her own behalf.

At the conclusion of the testimony, respondent's attorney argued that the trial court could not terminate respondent's parental rights because the State failed to prove that it had made active efforts to provide remedial services pursuant to the ICWA. Respondent's attorney further argued that the State was required to submit proof of active efforts beyond a reasonable doubt.

The trial court found that respondent was incarcerated outside the state as the result of his own conduct. The trial court further found that respondent's incarceration placed him "beyond the reach of services that ideally would be designed for family reunification." The trial court found that respondent was aware of the actions required of him in the service plans. The trial court also found that respondent was in a better position than Family Advocate to determine what services were available to him from the Missouri DOC. The trial court further found that services were available to respondent and that he did receive some services from the Missouri DOC. The trial court concluded that Family Advocate met the active efforts requirement of the ICWA by sending respondent copies of the service plans. The trial court further held that the State had satisfied its burden of demonstrating active efforts beyond a reasonable doubt.

The trial court subsequently decided that it was in the minors' best interest to terminate respondent's parental rights. The trial court also held that the testimony of Sharon Skenandore established that the Oneida tribe had been actively involved in the court proceedings, monitoring them and making recommendations to the trial court. The trial court found that the Oneida tribe's recommendations were in accord with the court's own determinations regarding the best interest of the minors. We note that the record on appeal does not contain a transcript of Skenandore's testimony. However, because the record is incomplete, we will presume that the trial court's conclusions regarding this issue had a sufficient factual basis. See *In re W.L.W.*, 299 Ill. App. 3d 881, 884 (1998).

After announcing its decision, the trial court continued the matter for the entry of a final order. Respondent's attorney subsequently

informed the trial court that the Missouri DOC had recently contacted him and informed him that it would allow respondent to participate in the proceedings via telephone. Respondent's attorney moved to reopen the proofs to allow respondent to testify via telephone, and the trial court granted the motion. The matter was continued several times, but respondent ultimately refused to participate. On June 28, 2001, the trial court entered an order terminating respondent's parental rights. Respondent timely appeals.

The parties agree that the ICWA applies in this case and that, with the exception of the active efforts requirement, its jurisdictional and procedural requirements were met. Respondent does not contend that the State failed to meet its burden of proof on the substantive questions of whether he was unfit or whether it was in the minors' best interests to terminate his parental rights. Instead, respondent contends only that the trial court erred when it terminated his parental rights because the State failed to establish that it had made active efforts to prevent the breakup of an Indian family.

Respondent's "active efforts" contention raises three distinct issues on appeal: (1) whether the active efforts provisions of the ICWA apply to respondent, (2) the burden of proof against which those efforts are judged, and (3) whether the State met that burden of proof to establish compliance with the active efforts requirement. The relevant facts are undisputed, and the resolution of these issues depends primarily on our interpretation of the ICWA. Therefore, whether the trial court properly applied the ICWA to the facts of this case is a question of law that we may review *de novo*. See *In re C.N.*, 196 Ill. 2d 181, 203 (2001). The issues presented are apparently ones of first impression in Illinois. Therefore, we have looked to the decisions of our sister states for instruction.

The first issue is whether the active efforts requirement of section 1912(d) applies to respondent. The State argues that it was not required to prove that it made active efforts to provide remedial services because there was no Indian family to break up. The State contends that respondent's conduct had broken up the family before the State became involved.

In *In re Dougherty*, 236 Mich. App. 240, 599 N.W.2d 772 (1999), the Michigan court of appeals addressed the relationship between sections 1912(d) and 1912(f). The *Dougherty* court held that sections 1912(d) and 1912(f) can operate independently and that section 1912(d) does not require that active efforts be made to reunite a child with the parent unless the termination of parental rights results in the breakup of an Indian family. *Dougherty*, 236 Mich. App. at 244, 599 N.W.2d at 775. The reviewing court further held that there was no

"Indian family" within the meaning of section 1912(d) when the father did not reside with or support his children financially and was incarcerated for crimes committed against the children. *Dougherty*, 236 Mich. App. at 244-45, 599 N.W.2d at 775. The reviewing court concluded that the breakup of the family was a *fait accompli* and that active efforts were not required. *Dougherty*, 236 Mich. App. at 245, 599 N.W.2d at 775.

Other courts have adopted the conflicting view that incarceration alone is insufficient to eliminate the active efforts requirement of section 1912(d). See, *e.g.*, *D.J. v. P.C.*, 36 P.3d 663 (Alaska 2001). The Alaska supreme court held that a parent's incarceration can diminish the level of active efforts required under the ICWA but that incarceration does not eliminate the active efforts requirement. *D.J.*, 36 P.3d at 673.

■ The ICWA is a remedial statute designed to protect the rights of "Indian children" as "Indians." See *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 37, 104 L. Ed. 2d 29, 39, 109 S. Ct. 1597, 1602 (1989). We believe that, in light of the remedial purpose of the statute, it should be given a liberal interpretation. However, we also believe that under appropriate circumstances a court may find that no Indian family exists for the ICWA to protect. See *Dougherty*, 236 Mich. App. at 244-45, 599 N.W.2d at 775. In the case before us, unlike the *Dougherty* case, the State failed to demonstrate either that respondent was separated from his family before his incarceration or that his incarceration was the direct result of violence against a member of the family. The State did present credible evidence of violent behavior by respondent toward his family in Illinois, but there was no evidence that this violent behavior was the cause of his incarceration in Missouri. Accordingly, in this case we have elected to follow the approach of the Alaska courts, and we hold that respondent's incarceration affected, but did not eliminate, the active efforts requirement.

■ The next issue is the standard against which active efforts must be judged. The trial court applied the "beyond a reasonable doubt" standard to the State's efforts in this case. On appeal, respondent alludes to, but does not provide authority for, this standard. The State, on the other hand, argues that the "satisfy the court" language of section 1912(d) implies a deferential, abuse of discretion standard. Although there is conflicting authority on this issue, we find the decision of the Alaska supreme court in *K.N. v. State*, 856 P.2d 468 (Alaska 1993), persuasive. The *K.N.* court noted that the plain language of section 1912(d) does not include the "beyond a reasonable doubt" standard included in section 1912(f). *K.N.*, 856 P.2d at 476. The *K.N.* court

concluded that active efforts need only be established by a preponderance of the evidence. *K.N.*, 856 P.2d at 476. We believe that it is not inherently illogical to apply different standards of proof under different sections of the ICWA. See *In re Dependency of A.M.*, 106 Wash. App. 123, 133, 22 P.3d 828, 833 (2001). Therefore, we conclude that the State was required to establish compliance with the active efforts requirement by a preponderance of the evidence.

■ The final issue is whether the State presented sufficient evidence to establish compliance with the active efforts requirement by a preponderance of the evidence. When a parent is incarcerated the relevant question is whether the State's efforts to provide remedial services are appropriate under the circumstances. See *A.M. v. State*, 945 P.2d 296, 305-06 (Alaska 1997).

In the case before us, it is undisputed that (1) respondent was incarcerated in Missouri, (2) Family Advocate mailed respondent copies of the case plans, (3) respondent sent correspondence to Family Advocate, (4) Family Advocate responded to only some, or none, of the correspondence it received from respondent, and (5) respondent completed at least one anger management course and one substance abuse course in the Missouri DOC.

In *A.M.*, the Alaska supreme court observed that when a parent is incarcerated "[i]t is of no particular consequence" whether services were provided by Alaska's department of corrections or Alaska's family services division. *A.M.*, 945 P.2d at 305. The court held that active intrusion by the family services division into the department of corrections' therapeutic programs would have been "inappropriate and unreasonable, if not *** impossible as a matter of practical reality." *A.M.*, 945 P.2d at 306. The Alaska supreme court concluded that the family services division met the active efforts requirement when it maintained contact with the parent and encouraged his treatment efforts within the department of corrections. *A.M.*, 945 P.2d at 306.

The Alaska supreme court reached a similar result in *T.F. v. State*, 26 P.3d 1089 (Alaska 2001). In that case, the Alaska supreme court found that the family services division met the active efforts requirement by contacting the respondent father's probation officer to ensure that he was enrolled in the appropriate classes in jail. *T.F.*, 26 P.3d at 1095 n.28. The California court of appeal considered a similar issue in *In re William G.*, 89 Cal. App. 4th 423, 107 Cal. Rptr. 2d 436 (2001). The *William G.* court held that, if a parent's voluntary absence makes her or him unavailable to receive services, repeatedly attempting to contact the parent and inform her or him of the availability of services can meet the active efforts requirement. *William G.*, 89 Cal. App. 4th at 428, 107 Cal. Rptr. 2d at 439.

In the case before us, the ability of Family Advocate to provide services to respondent was impaired by respondent's incarceration in Missouri. We observe, as the trial court did, that respondent's incarceration was the result of his own voluntary conduct and a condition over which Family Advocate had no control. Under these circumstances, it was the Missouri DOC, not Family Advocate, that had the ability to provide services to respondent. See *A.M.*, 945 P.2d at 306. Nevertheless, it is undisputed that Family Advocate regularly provided respondent with copies of the case plans and that those case plans indicated the services that would be appropriate for respondent. Further, the evidence respondent presented established that at least some services were available to him, and he did receive services from the Missouri DOC. Family Advocate attempted to monitor the services provided by the Missouri DOC, but the caseworker testified that its ability to do so was hampered by respondent's refusal to provide the appropriate releases. Clearly the communications and attempts to monitor respondent's services out of state by Family Advocate establish by a preponderance of the evidence the active efforts required by the ICWA. Therefore, we conclude that the trial court did not err when it held that this procedural requirement had been met and proceeded to address the State's substantive allegations of unfitness. Because respondent has raised no issue on appeal regarding the substance of the trial court's judgment, we need not address whether the State proved that respondent was unfit or whether it was in the best interest of the minors to terminate his parental rights.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

McLAREN and GROMETER, JJ., concur.