# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re M.H.*, 2011 IL App (1st) 110196

---

| | |
|---|---|
| Appellate Court Caption | *In re* M.H., A MINOR (The People of the State of Illinois, Petitioner-Appellee, v. Charlotte B. and Charles H., Respondents-Appellants (Bad River Band of Lake Superior Tribe of Chippewa Indians, Intervenor-Appellant)). |
| District & No. | First District, Sixth Division<br>Docket Nos. 1-11-0196, 1-11-0259, 1-11-0375 cons. |
| Filed | August 12, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court properly terminated respondents' parental rights to their child, who was an Indian child under the Indian Child Welfare Act by virtue of the mother's status as an enrolled member of a tribe, and the denial of the tribe's petition to transfer the proceedings to the tribal court was upheld. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-JA-716; the Hon. Richard A. Stevens, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Abishi C. Cunningham, Jr., Public Defender, of Chicago (Robert C. Drizin, Assistant Public Defender, of counsel), for appellant Charlotte B.

Brian Collins, of Chicago, for appellant Charles H.

Arthur D. Sutton, of Arthur D. Sutton & Associates, of Matteson, and Joseph F. Halloran, *pro hac vice*, and Sara K. Van Norman, *pro hac vice*, both of Jacobson, Buffalo, Magnuson, Anderson & Hogen, P.C., of St. Paul, Minnesota, for appellant Bad River Band of Lake Superior Tribe of Chippewa Indians.

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Susan S. Wigoda, of counsel), and Jamie E. Knight, law student, guardian *ad litem*.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Nancy Kisicki, and Jessica R. Bargmann, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE CAHILL delivered the judgment of the court, with opinion.

Presiding Justice Garcia and Justice R. Gordon concurred in the judgment and opinion.

## OPINION

¶ 1     Respondents, Charlotte B. and Charles H., are the biological parents of M.H., a minor. M.H. is an Indian child under the Indian Child Welfare Act of 1978 (Act) (25 U.S.C. § 1901 *et seq.* (1994)) because she is eligible for membership in the respondent tribe, Bad River Band of the Lake Superior Tribe of Chippewa Indians (Tribe), due to her mother's status as an enrolled member of the Tribe. See 25 U.S.C. § 1903(4) (1994). Respondents separately appeal (Charlotte B., appeal No. 1-11-0196; Charles H., appeal No. 1-11-0375; Tribe, appeal No. 1-11-0259) from a December 20, 2010, order of the circuit court of Cook County which terminated Charlotte's and Charles's parental rights to M.H. on findings of unfitness under sections 1(D)(b), (m) and (n) of the Adoption Act (750 ILCS 50/1(D)(b), (D)(m), (D)(n) (West 2008)). The same order determined that it was in the best interest of M.H. that a guardian be appointed with the right to consent to her adoption. The Tribe also appeals from

-2-

the court's May 18, 2010, order denying its petition to transfer the proceedings to the tribal court. We have consolidated these appeals for review and affirm the judgment of the circuit court.

¶ 2        M.H. was born on August 2, 2007, prenatally exposed to a controlled substance. The Illinois Department of Children and Family Services (DCFS) took protective custody of M.H. on August 27, 2007. On the next day, the State filed a petition for adjudication of wardship, alleging Charlotte had five earlier indicated reports for having had a substance-exposed infant and four minors in the care and custody of DCFS after findings of abuse and neglect were entered against her. The State also alleged M.H. was neglected because her environment was injurious to her welfare and abused due to a substantial risk of physical injury under the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b), (2)(ii) (West 2008)). M.H. was placed in the custody of a nonrelative foster parent on August 30, 2007.

¶ 3        On March 7, 2008, the State filed a motion to amend the adjudication petition, seeking permanent termination of parental rights and appointment of a guardian with the right to consent to M.H.'s adoption. The State alleged Charlotte and Charles were unfit parents under sections 1(D)(a), (b), (l) and (t) of the Adoption Act because: (1) they abandoned M.H. (subsection (a)); (2) they failed to maintain a reasonable degree of interest, concern or responsibility for M.H.'s welfare (subsection (b)); (3) they failed to demonstrate a reasonable degree of interest, concern or responsibility for M.H.'s welfare during the first 30 days of her life (subsection l)); and (4) Charlotte had at least one child who was adjudicated neglected, after which she had an opportunity to enroll in drug treatment and later gave birth to M.H., who was prenatally exposed to a controlled substance (subsection (t)) (750 ILCS 50/1(D)(a), (D)(b), (D)(l), (D)(t) (West 2008)). The court granted the motion on March 18, 2008, and set a trial date of July 10, 2008, for adjudication and termination of parental rights.

¶ 4        On April 18, 2008, the court entered a default order against Charlotte for want of appearance. On the same date, under the Act, the court ordered the State to notify the Tribe of the juvenile proceeding involving M.H. The State issued a notice on May 13, 2008, to Eugene Bigboy, Sr., chairman of the Tribe. The Tribe received notice on May 19, 2008. The notice informed the Tribe that it had a right to intervene and petition the court to transfer the proceeding to the tribal court. The notice also admonished the Tribe of the importance of attending the proceeding, which could result in the Indian parents' loss of custody of the child, a finding of unfitness and the child's placement for adoption.

¶ 5        Charlotte and Charles appeared in court on July 10, 2008. The court vacated the default order entered against Charlotte and appointed counsel for her and Charles. The State then withdrew its motion for termination of parental rights without prejudice.

¶ 6        The court held an adjudicatory hearing on August 14, 2008. John Steele, a DCFS investigator, testified that M.H. was born on August 2, 2007, and, along with Charlotte, tested positive for opiates. The day after M.H. was born, Steele asked Charlotte to attend inpatient drug treatment. Charlotte did not seek treatment. Steele spoke to Charlotte about two weeks later. During their conversation, Charlotte expressed interest in reuniting with M.H. Steele again advised Charlotte that she needed to undergo drug treatment. Four days

later, Steele conducted a home assessment. Steele said that during the assessment Charlotte appeared to be under the influence of drugs and admitted using heroin and methadone that day. Steele determined that it was in the best interest of M.H. that DCFS take protective custody of her because Charlotte's drug addiction put M.H.'s safety in jeopardy and Charles's health, financial and transportation issues prevented him from meeting M.H.'s needs.

¶ 7    The State entered into evidence Charlotte's and M.H.'s medical records and Charlotte's five earlier indicated reports of neglect and abuse. The court found by clear and convincing evidence that M.H. was a drug-exposed infant and neglected due to an injurious environment.

¶ 8    The court held a disposition and permanency hearing also on August 14, 2008. Leslie Jacob, a Children's Home and Aid Society (CHAS) caseworker, testified about her efforts to engage Charlotte and Charles in services designed to reunite them with M.H. Jacob said CHAS recommended that Charlotte and Charles complete a "Juvenile Court Assessment Program" (JCAP), visit M.H. and participate in parenting classes and individual therapy. Charlotte did not make herself available for an assessment, visit M.H., request visitation or seek treatment. Charles visited M.H. once during the first year of her life but did not make himself available for a CHAS service assessment. Charles completed a JCAP assessment in December 2007 but did not participate in outpatient services as recommended by the assessment or cooperate with his treatment coach. He also did not visit M.H. regularly, attend parenting classes, participate in individual therapy or undergo a second JCAP assessment as recommended.

¶ 9    Jacob said LaVergne H., Charles's mother, was granted monthly visitation in December 2007. LaVergne visited M.H. four times. Jacob said CHAS did not recommend M.H. be placed in LaVergne's custody because initially she refused custody. Since then LaVergne wavered on the subject of placement.

¶ 10   Jacob further testified that when she learned of Charlotte's membership in the Tribe, she contacted Pamela Barningham, a case manager for the Tribe's "Indian Child Welfare Program." Jacob told Barningham that Charlotte and Charles were not participating in the recommended services for reunification with M.H. Barningham approved M.H.'s placement in foster care in June 2008.

¶ 11   The State introduced into evidence an affidavit executed by Barningham on August 12, 2008. The court admitted the affidavit as expert testimony from an Indian witness under the Act. Barningham said in the affidavit that the Tribe had been aware of the case since May 2008. Barningham also said that CHAS made active efforts to provide rehabilitative services and programs designed to prevent the breakup of the Indian family and that the efforts were unsuccessful because the parents did not take advantage of the services. Barningham opined that continued custody of M.H. by Charlotte and Charles would likely result in serious emotional or physical harm to M.H. Barningham averred that the Tribe wished for M.H. to remain with her foster parents until reunification.

¶ 12   At the close of evidence, the court found Charlotte and Charles were unable to care for,

protect, train or discipline M.H. The court determined that it was in M.H.'s best interest to be adjudicated a ward of the court. The court changed the permanency goal from return home within 12 months to return home pending status because Charlotte and Charles failed to make substantial progress toward reunification. On May 22, 2009, the permanency goal was changed to substitute care pending the court's determination on termination of parental rights.

¶ 13    On September 1, 2009, the State filed a supplemental petition for the appointment of a guardian with the right to consent to adoption. The State alleged in the supplemental petition that Charlotte and Charles were unfit parents under sections 1(D)(b), (c), (l), (m) and (n) of the Adoption Act because they: (1) failed to maintain a reasonable degree of interest, concern or responsibility for M.H.'s welfare (subsection (b)); (2) deserted M.H. (subsection (c)); (3) failed to demonstrate a reasonable degree of interest, concern or responsibility for M.H.'s welfare during the first 30 days of her life (subsection (l)); (4) failed to make reasonable efforts to correct the conditions that were the basis for removal of M.H. and/or failed to make reasonable progress toward the return of M.H. within 9 months after adjudication of neglect (subsection (m)); and (5) evidenced an intent to forego parental rights (subsection (n)) (750 ILCS 50/1(D)(b), (D)(c), D)(l), (D)(m), (D)(n) (West 2008)).

¶ 14    Two days later, on September 3, 2009, the court received the Tribe's petition to transfer the proceeding to the tribal court in Odanah, Wisconsin, and dismiss the state court action. The State filed a motion opposing the transfer. The court held a hearing on the Tribe's petition, commencing on September 5, 2009, and continuing to December 9, 2009. On December 9, 2009, the tribal attorney asked for a continuance because inclement weather prevented him from traveling to Chicago from Odanah. The hearing was concluded on May 5, 2010.

¶ 15    At the hearing, Denise McCutcheon-Cloud, a caseworker for the Indian Child Welfare Program, testified she was assigned to M.H.'s case after Barningham's termination in June or July 2009. McCutcheon-Cloud disagreed with Barningham's approval of M.H.'s placement in foster care because the foster mother was not a relative or a certified Native American foster parent. McCutcheon-Cloud said M.H. could have been placed with Agnes McGue, M.H.'s maternal grandmother.

¶ 16    McCutcheon-Cloud testified that in October 2009, Charlotte and Charles accepted her offer to move to the Tribe's reservation and receive rehabilitative services. She said Charlotte and Charles wanted the case to be transferred to the tribal court. McCutcheon-Cloud explained that if the case was transferred to the tribal court, the Tribe would hear witnesses in person or by phone and allow the parties to submit documents by mail or fax. She said the Tribe would provide transportation and lodging for the witnesses. McCutcheon-Cloud acknowledged that the Tribe did not raise concerns about M.H.'s placement until July 2009.

¶ 17    Jacob testified that two weeks after M.H. was born, Steele asked McGue if she was willing to take custody of M.H. McGue declined and said that no maternal relative was willing or able to take custody of M.H. LaVergne also declined custody of M.H. Jacob said CHAS learned that M.H. was an Indian child under the Act on October 22, 2007, when

Charlotte told them that she was Native American. Charlotte did not know the name of her tribe. Jacob said CHAS tried to identify the tribe but was unable to locate Charlotte or Charles because their whereabouts was unknown between October 22, 2007, to August 2008. Jacob asked Leslie Powless, a DCFS liaison, for help finding them. With Powless's help, Jacob learned that Charlotte was a member of the Tribe. Jacob notified Barningham on June 9, 2008, that M.H. had been placed with a nonrelative in a foster home. Jacob said Barningham told her that the Tribe did not want to get involved in the proceedings unless the permanency goal changed from reunification.

¶ 18    Jacob testified that she would suffer hardship if the case was transferred to Odanah, Wisconsin. She explained that it would be difficult for her to rearrange her caseload to appear for judicial proceedings 400 miles away.

¶ 19    Powless testified that she assisted Jacob in determining M.H.'s status under the Act. Powless said McGue told her Charlotte was a member of the Tribe. Powless verified M.H.'s eligibility for membership in the Tribe with the Tribe's enrollment department. She then spoke with Barningham to determine to what extent the Tribe would be intervening in the proceedings. Powless said it was regular practice to communicate with tribes through their Indian child welfare caseworkers. On June 10, 2008, Barningham told Powless that the Tribe would not intervene in the case. In March 2009, Powless notified Barningham that the foster mother was interested in adopting M.H. Powless said Barningham told her that the Tribe would not oppose adoption as long as the foster parents kept M.H. connected to her culture and the Tribe.

¶ 20    Powless said it would be a hardship for her to travel to Odanah, Wisconsin, because of her large caseload.

¶ 21    Lynsey Sloan, a CHAS caseworker assigned to M.H.'s case, testified she contacted McGue on February 6, 2009. Sloan said McGue expressed interest in taking custody of M.H. Sloan conducted an assessment of McGue's home on March 31, 2009. After the assessment, Sloan recommended that M.H. not be placed with McGue. In July 2009, McCutcheon-Cloud asked CHAS to reevaluate McGue's home for placement and investigate other possible relative placements. The Tribe agreed to forward to CHAS the criteria to be used for the assessment. Sloan said she never received the Tribe's assessment criteria. In October 2009, McCutcheon-Cloud instructed CHAS to use its own assessment factors. McGue's home was reassessed on February 27, 2010. CHAS again did not recommend M.H. be placed with McGue and recommended M.H. remain with her foster parents.

¶ 22    Sloan testified she lives in Illinois and works in Chicago. She said she would experience hardship if the case was transferred to Odanah, Wisconsin.

¶ 23    Lisa M., M.H.'s foster mother, testified that M.H. has lived with her since August 30, 2007, when she was 28 days old. Lisa said Charlotte did not visit M.H. in 2007 and 2008. She said Charles visited M.H. once during that period. Lisa testified to the cultural activities and events she participated in with M.H. to foster her Indian heritage. Lisa said that because of her work schedule and the schedule of her children, it would be burdensome for her to travel to Odanah.

¶ 24    McGue testified on Charlotte's behalf. McGue said she refused placement in August 2007 because of financial reasons. She said she did not recommend other relatives to CHAS for placement. McGue acknowledged that she knew M.H. was in the custody of DCFS. McGue did not seek custody of M.H. when she regained financial stability in April 2008.

¶ 25    The court took judicial notice of Barningham's affidavit and the evidence adduced at the August 14, 2008, disposition and permanency hearing. The court also admitted into evidence the May 13, 2008, notice of the juvenile proceeding which was received by Bigboy, Sr., chairman of the Tribe. The court then denied the Tribe's petition. In its May 18, 2010, written order, the court noted that because the bulk of the evidence and the majority of the witnesses were located in Illinois, transfer would constitute an undue hardship. The court also found the petition was untimely because the proceeding was at an advanced stage, given that Charlotte's and Charles's parental rights had been in jeopardy since March 7, 2008, the date the State moved to amend its adjudication petition and seek the termination of parental rights. The court noted that the State's motion was granted more than 18 months before the Tribe filed its petition to transfer. The court also noted that the conclusion of the hearing was delayed to May 5, 2010, because the Tribe's attorney was unable to appear in court on two occasions.

¶ 26    The case proceeded to an evidentiary hearing on the State's supplemental petition for termination of parental rights and the appointment of a guardian with the right to consent to adoption on August 17, 2010. The hearing was separated into a fitness and best interest hearing.

¶ 27    At the fitness hearing, Shira Belkov, a CHAS caseworker, testified she was assigned to M.H.'s case from August 2007 to April 2008. Belkov said that she was unable to locate Charlotte and Charles after M.H. was born. The parents were found in October 2007, living in Lombard, Illinois. On October 22, 2007, Belkov visited the parents' home and advised them of their right to visitation with M.H. and that they needed to be assessed for services. Belkov also told them when the next court date was and offered them bus passes for transportation. Belkov said Charlotte appeared to be under the influence of drugs during the visit.

¶ 28    Belkov testified that over the course of the next two months neither Charlotte nor Charles visited M.H. or sent her letters or gifts. Charles completed a JCAP assessment on December 20, 2007, and expressed an interest in participating in reunification services. Charles did not receive substance abuse treatment. On February 22, 2008, Charlotte called Belkov and told her she was homeless, using heroin and needed substance abuse treatment. Belkov tried to schedule visitation for Charlotte and M.H., encouraged Charlotte to undergo a JCAP assessment and offered her bus passes to access those services. Charlotte did not visit M.H., pick up the bus passes from Belkov or take advantage of the CHAS services. Charlotte did not complete a JCAP assessment or substance abuse treatment.

¶ 29    Jacob testified that she managed M.H.'s case from April 2008 to September 2008. She said she performed a diligent search for the parents on April 7, 2008, but was unable to locate them. Jacob said she first met Charles on May 30, 2008, when he accompanied LaVergne on

her visit with M.H. During the visit, Jacob advised Charles of the importance of participating in rehabilitative services, visiting M.H. and being assessed by CHAS. Charles agreed to schedule a JCAP assessment but never did. Jacob said she maintained contact with Charles through LaVergne.

¶ 30    Jacob also testified that neither Charlotte nor Charles sent cards, gifts or letters to M.H. from April 2008 to September 2008. Jacob said that Charlotte's whereabouts was unknown during this period. Jacob acknowledged that Charlotte appeared in court on July 10, 2008. On that date, Jacob asked Charlotte and Charles to participate in a JCAP assessment after the hearing but they refused. On August 13, 2008, Charles called Jacob and expressed an interest in reunification services. He also acknowledged receiving Jacob's letter, informing him of the upcoming court date and advising him of his assessment needs. Charles agreed to contact CHAS but failed to do so.

¶ 31    Sloan testified that she was assigned to M.H.'s case in September 2008. Sloan said that she tried on multiple occasions between September 2008 to July 2009 to locate Charlotte and Charles but was unsuccessful. Sloan said she asked LaVergne and the parents' attorneys for the parents' whereabouts and sent letters to seven different addresses for Charles and five different addresses for Charlotte. Sloan did not have contact with the parents from September 2008 to July 2009 because their whereabouts was unknown. On July 10, 2009, Charlotte contacted Sloan and Sloan advised her of the proceedings. At the next court date, Charlotte expressed interest in visiting M.H. Charlotte did not schedule a visit.

¶ 32    In November 2009, Sloan met with Charlotte and Charles. During the meeting, Sloan advised the parents of their visitation rights. Charlotte visited M.H. in November 2009. Charlotte and Charles visited M.H. in February 2010. After the visit, Sloan reviewed the service plan with the parents and explained that CHAS was no longer financially responsible for providing services because the permanency goal had changed from reunification to termination of parental rights. Charlotte told Sloan that she and Charles had moved to Ashland, Wisconsin in October 2009 to be near the Tribe. Sloan said that neither Charlotte nor Charles was able to provide proof of completion of substance abuse treatment, parenting education or therapy.

¶ 33    Sloan further testified that she was unable to refer the parents to treatment because their whereabouts was unknown during the pendency of the case and they failed to make themselves available for an assessment. Sloan said she asked the parents and the Tribe to provide documentation of the rehabilitative services rendered. In June 2010, the Tribe provided Sloan with a negative drug test for the parents and a statement from Memorial Medical Center, saying the parents had undergone a three-day drug detoxification.

¶ 34    CHAS rated Charlotte unsatisfactory in the client service plan from August 2009 to February 2010 because she only visited M.H. once. Charles was also rated unsatisfactory for the same period because he failed to provide CHAS with a proof of completion of rehabilitative services.

¶ 35    After reviewing the testimony presented, the court found the State proved the parents unfit beyond a reasonable doubt by: failing to maintain a reasonable degree of interest,

concern and responsibility for M.H.; failing to make reasonable efforts for reunification during the nine months following adjudication of neglect; and evidencing an intent to forego their parental rights.

¶ 36    At the best interest hearing, the court took notice of the evidence adduced at the fitness hearing. The State then presented the testimony of Charles and Charlotte. Charles testified that he was unemployed and lived in subsidized housing in Ashland, Wisconsin. He said he completed a three-day heroin detoxification program in October 2009.

¶ 37    Charlotte testified that she used heroin and methadone for 15 years. She said she moved to Wisconsin with Charles in October 2009. At that time, she was using heroin and methadone daily. Charlotte completed a drug detoxification program on December 7, 2009. On the day of her testimony, Charlotte was arrested on an open warrant.

¶ 38    Doctor Adelle Sanders testified as an Indian child welfare cultural expert. Sanders said she spent more than 33 hours reviewing CHAS's and the Tribe's case files and meeting with Charlotte, McCutcheon-Cloud, Sloan, Powless and M.H.'s foster mother. Sanders also observed M.H. in her foster home. In a report filed with the court and admitted into evidence, Sanders concluded that CHAS made active efforts under the Act to provide services and rehabilitative programs designed to prevent the breakup of the Indian family. Sanders noted that CHAS made a number of inquiries as to the parents' whereabouts, conducted diligent relative searches, maintained ongoing contact with the Tribe through Barningham and received the Tribe's approval for the foster placement. Charlotte and Charles did not complete the services or make themselves available for a service assessment. Sanders explained that "it is very difficult to provide services to unwilling participants."

¶ 39    Dr. Sanders opined that continued custody of M.H. by the parents would likely result in serious emotional or physical harm to M.H. because Charlotte and Charles had not established a history of being able to change their behavior. Sanders said Charlotte and Charles needed to engage in counseling, substance abuse treatment, parenting education and random drug tests for at least six months before an opposite conclusion could be reached. Sanders recommended counseling, drug treatment, parental education and a medical assessment for both Charlotte and Charles. She also recommended that Charlotte receive extensive trauma counseling and monthly drug tests.

¶ 40    Dr. Sanders also opined that M.H.'s removal from her foster home after three years of bonding with her foster family would retraumatize her and possibly have long-term effects. Sanders based her opinion on research on attachment and observations of M.H. with her foster family. Sanders saw a seamless, loving mother-daughter relationship between Lisa M. and M.H. M.H. referred to Lisa M. as her mother and interacted lovingly with her foster sisters.

¶ 41    Dr. Sanders explained that the Act was not intended to allow a tribe to wait to intervene in a custody proceeding until an Indian child has become attached to a non-Native foster family. She said that M.H. did not need to be raised in a Native American home to maintain her cultural identity.

¶ 42    Margaret Waugh, M.H.'s therapist, testified as an expert in the field of clinical social

work. Waugh said M.H. started therapy around the time Charlotte and Charles began visiting her. Waugh said around that time, M.H. experienced nightmares and disruptions in her eating habits. Waugh said M.H. was most comfortable around her foster mother, whom she called "mom" and looked to for care. Waugh opined that M.H. would be negatively impacted if she were removed from her foster mother, who was her primary attachment.

¶ 43        Powless testified that she made concerted efforts to locate M.H.'s extended family but was unsuccessful. Powless said she asked McGue and LaVergne for the names and contact information of relatives who might be interested in custody of M.H. McGue and LaVergne did not provide Powless with this information. Powless also asked the Tribe to identify members of M.H.'s extended family who were living on the reservation. Powless said she spoke to seven people from the Tribe and asked them if M.H. had family members residing on the reservation who were interested in custody of M.H. The Tribe said M.H. had no family members residing on the reservation.

¶ 44        Powless, a Menomonee Indian, further testified that she believed Lisa M. made efforts to expose M.H. to her Indian ancestry. Powless said Lisa visited the Tribe's reservation and the "American Indian Center Powwow" with M.H. Lisa and M.H. also attended the American Indian Center Thanksgiving feast. Powless said she provided Lisa with a list of events from the American Indian Center and a directory of statewide Native American programs, activities and schools. Powless and Lisa frequently exchange information about upcoming Indian cultural programs. Powless said the Tribe has yet to comply with her request for tribal information to share with Lisa.

¶ 45        Lisa testified that when she took custody of M.H. on August 30, 2007, M.H. was inconsolable and suffering from symptoms of drug withdrawal. Lisa said M.H. is now a healthy, outgoing three-year-old girl. Lisa said that M.H. has bonded with Lisa's 16- and 11-year-old daughters and considers them to be her sisters. M.H. has also bonded with Lisa's large extended family. Lisa said she wanted to adopt M.H. and would continue to expose her to her culture, Tribe and extended family.

¶ 46        Sloan testified that when she received the case in September 2008, Charlotte's and Charles's whereabouts was unknown. Sloan performed diligent searches for the parents every few months. She sent Charlotte two letters, left voicemail messages and performed an in-person search in July 2009. Sloan first established contact with Charlotte and Charles in July 2009. Sloan advised the parents of the proceedings and the permanency goal change from reunification to termination of parental rights. Sloan said she tried to engage the parents in rehabilitative services despite the permanency goal change. She said she did not have an opportunity to refer the parents to community-based service providers in Illinois because they left the state shortly after she made contact with them.

¶ 47        Sloan further testified that the parents did not begin visiting M.H. until November 2009. She said that during the visits, M.H. was quiet and reserved. M.H. referred to Charles as "daddy" and did not address Charlotte. Sloan said that at the time of her testimony, she had visited M.H. in her foster home 26 times, during which M.H. interacted positively with her foster family and referred to Lisa as "mommy." Sloan said it was the recommendation of

-10-

CHAS that parental rights be terminated and the permanency goal be changed to adoption.

¶ 48    McGue testified on Charlotte's behalf. McGue related to the court the history of Charlotte's substance abuse and her efforts to get treatment. McGue said she had seen a "dramatic change" in Charlotte and that Charlotte had resolved her drug problem. McGue had visited M.H. regularly since August 2009 and wished to stay in contact with M.H. if M.H. is adopted.

¶ 49    Doctor Dorene Wiese also testified on Charlotte's behalf. The court precluded Wiese from offering an opinion on whether CHAS made active efforts to prevent the breakup of the Indian family and whether custody by the parents would cause M.H. serious physical or emotional harm. Wiese opined that M.H. should be removed from her foster home. She based her opinion on conversations with Charlotte, Charles and McCutcheon-Cloud.

¶ 50    Charles testified on his own behalf. He said he had visited M.H. regularly since February 2010. Charles said he and Charlotte had been sober for 18 months and had custody of their twin boys, who were born after M.H.

¶ 51    Doctor Alton Smart testified as an expert in Indian child welfare social work on behalf of the Tribe. Smart opined that it would not cause M.H. "immediate harm" to be removed from her foster home and placed with Charlotte and Charles. Smart based his opinion in part on conversations with McCutcheon-Cloud and her representation that the parents had been sober since May 2009. Smart acknowledged that he did not visit the foster home or speak to CHAS caseworkers about M.H.'s case. He also acknowledged that he did not know the parents were admitted into a hospital for heroin detoxification in October 2009 or that Charlotte relapsed in December 2009 and was again admitted into the hospital.

¶ 52    On December 20, 2010, the court issued its written order, finding "beyond a reasonable doubt" that it was in M.H.'s best interests to terminate parental rights and appoint a guardian with the right to consent to her adoption. The court also found by "clear and convincing" evidence that CHAS made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family as required by the Act. On the same date, the court entered a permanency order for M.H., showing that parental rights were terminated and that it was in M.H.'s best interest to be adopted by her foster mother.

¶ 53    On appeal, we first consider the Tribe's argument that the court erred in denying the Tribe's petition to transfer the proceeding to the tribal court. The Tribe claims the court's findings that transfer would cause undue hardship to the parties and witnesses and that the proceeding was at an advanced stage were not supported by the record.

¶ 54    The Act determines jurisdiction over Indian child custody proceedings. *In re C.N.*, 196 Ill. 2d 181, 203, 752 N.E.2d 1030 (2001). Under section 1911(b) of the Act, state courts and tribal courts have concurrent jurisdiction over proceedings for the placement or the termination of parental rights of an Indian child not domiciled or residing within the reservation of the child's tribe. *In re C.N.*, 196 Ill. 2d at 203-04; 25 U.S.C. § 1911(b) (1994). In such cases, when the tribe or a parent petitions the court for transfer, the state court must transfer the proceeding to the tribal court absent "good cause." *In re C.N.*, 196 Ill. 2d at 204.

¶ 55    What constitutes good cause not to transfer jurisdiction is set forth by the Department of

the Interior, Bureau of Indian Affairs (BIA). *In re Armell*, 194 Ill. App. 3d 31, 38, 550 N.E.2d 1060 (1990). The BIA has published guidelines to aid state courts in the appropriate application of the Act. Recommended Guidelines for State Courts: Indian Child Custody Proceedings, 44 Fed. Reg. 67,584 (Nov. 26, 1979) (Guidelines); *In re C.N.*, 196 Ill. 2d at 204. The Guidelines provide that good cause not to transfer exists when the child's tribe does not have a tribal court or when any of the following circumstances exists:

> "(i) The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing.
>
>     \*\*\*
>
> (iii) The evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses." 44 Fed. Reg. 67,584, 67,591 (Nov. 26, 1979).

¶ 56    We consider the undue hardship circumstance first. The tribal court is located in Odanah, Wisconsin, more than 400 miles from Chicago, where M.H. resides. Traveling this distance for the proceeding would be unduly burdensome on M.H., Lisa, Jacob, Sloan and the other potential witnesses involved in M.H.'s case, the majority of whom reside in Chicago. See *In re Adoption of S.S.*, 167 Ill. 2d 250, 264, 657 N.E.2d 935 (1995). Although Charlotte and Charles reside on the reservation, they spent a majority of their life in Chicago and did not move to the reservation until after the Tribe filed its petition to transfer. Because the bulk of the evidence and the majority of the witnesses necessary to the proceeding are located in Illinois, a transfer would constitute an undue hardship. *Adoption of S.S.*, 167 Ill. 2d at 264. We cannot say that the circuit court erred in denying the Tribe's petition on this ground.

¶ 57    We next consider whether the proceeding was at an "advanced stage." Neither the parties, the Guidelines nor the case law defines when a proceeding is at an "advanced stage." The Tribe argues that the proceeding was not at an advanced stage because it filed its petition to transfer "before the State filed its termination petition and promptly after the State changed the [permanency] goal" from reunification to termination. The Tribe claims that the State's filing on September 1, 2009, of the supplemental petition to terminate parental rights initiated a new proceeding under the Act, independent of the proceeding placing M.H. in foster care. The Tribe maintains that because its petition to transfer was filed just days after the State's supplemental petition, it was timely. In support of this argument, the Tribe relies on *In re A.B.*, 663 N.W.2d 625 (N.D. 2003).

¶ 58    We first note that we are unpersuaded by *In re A.B.* because this court is not bound by decisions from other jurisdictions. See *Klitzka v. Hellios*, 348 Ill. App. 3d 594, 599, 810 N.E.2d 252 (2004). In Illinois, "the filing of a petition to terminate parental rights does not initiate an entirely new proceeding within an existing case number." *In re Abner P.*, 347 Ill. App. 3d 903, 908, 807 N.E.2d 1145 (2004). The Act also does not make this distinction. Section 1903 defines a "child custody proceeding" to include:

> "(i) 'foster care placement' which shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or

institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated; [and]

(ii) 'termination of parental rights' which shall mean any action resulting in the termination of the parent-child relationship[.]" 25 U.S.C. §§ 1903(1)(i), (1)(ii) (1994).

¶ 59 Under the plain language of the Act, M.H.'s case commenced on August 30, 2007, the date she was placed in foster care. The State filed a petition for adjudication of wardship on August 29, 2007. The State filed a formal motion to amend the petition to seek termination of parental rights on March 7, 2008. The court granted the motion and set a trial date of July 10, 2008, for adjudication and termination of parental rights. In the meantime, on May 19, 2008, the Tribe was notified of the proceedings. The notice admonished the Tribe that "[t]he court hearing may result in the biological Indian parent or Custodian temporarily or permanently losing custody of this minor." Despite this, the Tribe did not file its motion to transfer until September 3, 2009,–more than 2 years after M.H. was placed in foster care and more than 15 months after the Tribe received notice of the proceedings. During this time, the court held adjudication, disposition and permanency hearings. The court also held a status hearing on May 22, 2009, after which it changed the permanency goal to substitute care pending determination on termination of parental rights because the parents failed to make progress toward reunification. Given these circumstances, the Tribe's petition was not timely. Under section 1911(b) of the Act, good cause existed to allow the circuit court of Cook County to retain jurisdiction over M.H.'s case. 25 U.S.C. § 1911(b) (1994). The court properly denied the Tribe's petition to transfer.

¶ 60 The Tribe also contends that the court committed reversible error by failing to place M.H. in an Act-compliant home. The Tribe claims the court should have held an evidentiary hearing to determine whether good cause existed to deviate from the Act placement requirements.

¶ 61 As pointed out by the State, the Tribe has forfeited review of this issue by not raising it in the court below. See *In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 377, 899 N.E.2d 355 (2008) (issues not raised in the trial court are forfeited and cannot be argued for the first time on appeal).

¶ 62 Forfeiture aside, M.H.'s placement was in compliance with the Act. Under section 1915(b)(ii), in the absence of good cause to the contrary, preference of placement shall be given to a placement with "a foster home licensed, approved, or specified by the Indian child's tribe." 25 U.S.C. § 1915(b)(ii) (1994). The record shows that Barningham, a caseworker for the Tribe's Indian child welfare program, executed an affidavit approving of M.H.'s placement in a nonrelative, non-Native foster home. The court admitted the affidavit into evidence as expert testimony from an Indian witness under the Act.

¶ 63 The Tribe, Charlotte and Charles next contend that the court erred in terminating parental rights. They claim that the evidence was insufficient to prove that CHAS made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of

the Indian family.

¶ 64    Under section 1912(d) of the Act, a party "seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d) (1994). The State has the burden to show compliance with the active-efforts requirement by a preponderance of the evidence. *In re Cari B.*, 327 Ill. App. 3d 743, 751, 763 N.E.2d 917 (2002). We review *de novo* whether the court properly applied the Act to the facts. *In re Cari B.*, 327 Ill. App. 3d at 749.

¶ 65    Here, the record supports the court's determination that the State met its burden of establishing active efforts by a preponderance of the evidence. CHAS offered a number of services to both parents, including service assessments, drug treatment, psychiatric evaluations, individual therapy, random urinalysis, parenting classes and visitation with M.H. See *In re D.D., Jr.*, 385 Ill. App. 3d 1053, 1061-62, 897 N.E.2d 917 (2008). CHAS also tried to provide the parents with bus passes to attend scheduled court dates, kept in regular contact with M.H.'s grandmothers and attempted to contact the parents on numerous occasions. CHAS's efforts were frustrated because the parents' whereabouts was unknown during most of the case. When Charlotte and Charles were finally located, they did not make themselves available for an assessment and failed to take advantage of the services offered by CHAS. Although Charles completed a service assessment, he failed to participate in outpatient services as recommended by the assessment or cooperate with his treatment coach. He also did not attend parenting classes, participate in individual therapy or undergo a second service assessment as recommended.

¶ 66    The Tribe, Charlotte and Charles also contend that the court erred in terminating parental rights based on a finding that the evidence showed beyond a reasonable doubt that custody of M.H. by Charlotte and Charles is likely to result in serious emotional damage to M.H. They claim that the court improperly considered the threat of emotional harm to M.H. as a factor in reaching its decision because such considerations are not relevant to the court's obligation to place an Indian child consistent with federal law.

¶ 67    Among other requirements, the Act requires the court to find that reunification presents a risk of serious emotional or physical harm to the child. 25 U.S.C. § 1912 (1994). Here, the court did just that. Dr. Sanders, an Indian child welfare cultural expert, testified that custody of M.H. by Charlotte and Charles would likely result in serious emotional or physical harm to M.H. because they had not established a history of being able to change their behavior. In reaching this conclusion, Sanders noted the parents' continued drug use and their failure to take advantage of the services offered by CHAS. Sanders also filed a written report with the court, detailing her findings. The court did not err in considering the risk of emotional or physical harm reunification would present to M.H. and basing its decision to terminate parental rights in part on this factor.

¶ 68    We affirm the judgment of the circuit court of Cook County.

¶ 69        Affirmed.