# Illinois Official Reports

## Appellate Court

---

### *In re F.O.*, 2014 IL App (1st) 140954

---

| | |
|---|---|
| Appellate Court Caption | *In re* F.O., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Angela B., Respondent-Appellant). |
| | |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-0954 |
| | |
| Filed | November 21, 2014 |
| | |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In proceedings arising from a petition for the adjudication of wardship of a nine-year-old minor based on the claim that he was neglected and abused and subject to a substantial risk of physical injury at the hands of respondent, his mother, the juvenile court, in subsequent proceedings seeking to terminate respondent's parental rights so that the minor could be adopted by the foster parents he had been living with following the adjudication of wardship, properly found that the minor was not an Indian child and was not subject to the Indian Child Welfare Act, since the juvenile court's investigation of the information provided by respondent about her alleged Indian heritage received no confirmation from any tribal organizations that respondent's allegations were recognized, the juvenile court's investigation was proper under the Act, and its finding was affirmed. |
| | |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-JA-865; the Hon. Maxwell Griffin, Jr., Judge, presiding. |
| | |
| Judgment | Affirmed. |

Counsel on Appeal

Abishi C. Cunningham, Jr., Public Defender, of Chicago (Suzanne A. Isaacson, Assistant Public Defender, of counsel), for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary Needham, and Nancy Kisicki, Assistant State's Attorneys, of counsel), for the People.

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain, of counsel), guardian *ad litem*.

Panel

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Palmer and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1     The instant appeal concerns one issue: Did the juvenile court properly determine that the minor, nine-year-old F.O., was not subject to the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 *et seq.* (2006)) prior to terminating respondent Angela B.'s parental rights? For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3     Since the issues on appeal concern only compliance with the ICWA and respondent is not challenging the factual or legal basis of the termination of her parental rights,[1] we relate the facts of the termination proceedings briefly for context and set forth facts concerning respondent's claimed Native American heritage in greater depth.

¶ 4                            I. Adjudication of Wardship

¶ 5     On October 16, 2007, the State filed a petition for adjudication of wardship, asking for F.O., a male minor born November 24, 2004, to be adjudicated a ward of the court; the State also filed a motion for temporary custody the same day. The adjudication petition claimed that F.O. was neglected due to an "environment *** injurious to his welfare" and was abused in that his parent or immediate family member "[c]reate[d] a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss of impairment of any bodily function."

¶ 6     The facts underlying both claims are the same. Respondent, F.O.'s mother, had two prior investigations for "substance misuse," "environment injurious to health and welfare," and

_____

[1]We note, however, that if respondent was to prevail on her claims, the termination of her parental rights would need to be conditionally reversed.

"substantial risk of physical injury." On October 12, 2007, respondent "brought this minor's sibling to Children's Memorial Hospital. This minor's sibling was deceased on arrival to the hospital. Medical personnel state that mother's explanation as to when the child died is not consistent with the condition of the body." Respondent admitted to a history of mental illness and that she threatened to kill herself and her children. "Mental health professionals" stated that respondent "has a mental health diagnosis of major depression with psychotic features, bi-polar and post traumatic stress disorder." Respondent was psychiatrically hospitalized, and the whereabouts of F.O.'s father were unknown.[2]

¶ 7        Based on the facts alleged in the State's petition for adjudication of wardship, on October 16, 2007, the juvenile court found probable cause that F.O. was abused or neglected and that immediate and urgent necessity existed to support his removal from the home. The court granted temporary custody to the Department of Children and Family Services (DCFS) guardianship administrator with the right to place F.O.

¶ 8        On July 24, 2008, the juvenile court entered an adjudication order finding F.O. neglected due to "injurious environment," in part because "the natural mother failed to recognize that the 3 month old sibling of this minor was deceased for at least 2 hours while in her care and custody." On August 21, 2008, the juvenile court entered a disposition order making F.O. a ward of the court and finding respondent unable for some reason other than financial circumstances alone to care for, protect, train, or discipline him. The court further found that reasonable efforts had been made to prevent or eliminate the need for removal of F.O. from his home. The court placed F.O. in the custody of a DCFS guardianship administrator with the right to place him.

¶ 9        Respondent appealed, and we affirmed the juvenile court. *In re F.O.*, No. 1-08-2495 (2008) (unpublished order under Supreme Court Rule 23).

¶ 10                                    II. Termination Petition

¶ 11        On July 10, 2012, the State filed a supplemental petition for the appointment of a guardian with the right to consent to adoption (termination petition). In its petition, the State alleged, *inter alia*, that respondent was unfit because she had "failed to make reasonable efforts to correct the conditions which were the basis for the removal of the child from [her] and/or ha[d] failed to make reasonable progress toward the return of the child to [her] within 9 months after the adjudication of neglect or abuse under the Juvenile Court Act, *** and/or within any 9 month period after said finding," in violation of section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2012)) and section 2-29 of the Juvenile Court Act of 1987 (705 ILCS 405/2-29 (West 2012)). Additionally, the petition alleged that it would be in F.O.'s best interest to appoint a guardian with the right to consent to his adoption because he had resided with his foster parent since October 2007, the foster parent wished to adopt F.O., and adoption by the foster parent would be in F.O.'s best interest.

¶ 12        On January 25, 2013, the parties came before the juvenile court for a trial on the State's termination petition, which lasted over several court dates. Prior to the start of trial on April 3, 2013, the court stated that it wished to "address the ICWA concern." The State indicated that respondent had testified in 2008 that she had Native American heritage through several tribes,

[2]F.O.'s father is not a party to the instant appeal. Accordingly, we relate facts concerning F.O.'s father only where necessary to our consideration of the instant appeal.

but also testified that she was not an enrolled member of any tribe and did not have any enrolled family members. The court noted that although respondent had previously made comments suggesting that she was not aware of any family member who was enrolled in an Indian tribe, under the ICWA, "even though the family member may not be enrolled, the child may be eligible for enrollment."

¶ 13      The court explained:

> "The standard for, or the requirements for eligibility in any particular Indian tribe, is dictated by that tribe, and it varies from tribe to tribe. Certain relations may make you eligible in one tribe for membership. Those same exact relations in another tribe might not make you eligible.
>
> That's why we give notice to the tribe, so they can make a determination as to whether they would claim that the child in question, in this case [F.O.], is eligible and entitled to the protections of the ICWA."

The court instructed respondent's counsel that "I'm going to ask you to sit down with your client and specifically determine what the nature of her American Indian heritage is; okay? And then the parties will work together to confirm one way or the other what if anything was done to follow up." The court stated that "before we conclude these proceedings, I'm going to make sure that we have complied with ICWA. It comes late in the game, but it's–I think we need to do that."

¶ 14      At that same court date, prior to presenting closing argument, respondent discussed her Native American heritage with the court:

> "RESPONDENT'S COUNSEL: [T]he Court did direct me to talk to my client about the Native American Indian heritage and the issues that were brought up. I have spoken to my client in regards to those issues.
>
> My client says that in January of 2008, she did specifically identify a number of tribes/nations of the–
>
> THE COURT: Yeah. So, what are they?
>
> RESPONDENT'S COUNSEL: That would be the Apat–Athabascan Muskogeon–Muskogeon, and that is Choctaw.
>
> Correct?
>
> RESPONDENT: May I speak, Judge?
>
> THE COURT: Sure.
>
> RESPONDENT: Okay. As I have told counsel here, Choctaw is Muskogeon. Seminole Creek is Muskogeon. Mescalero Apache is Athabascan.
>
> With Native Americans, you have a nation and then the name is the tribe; and due to the U.S. government and some politics, you know, so…
>
> RESPONDENT'S COUNSEL: What are the names?
>
> RESPONDENT: The Athabascan is Mescalero Apache. Seminole Creek is Muscogee. Choctaw, C-h-o-c-t-a-w, is Muskogeon.
>
> THE COURT: Thank you.
>
> RESPONDENT: I'd just like to make that clear again, please. Sorry.

THE COURT: That's all right. But what are you telling me about this? Are you–You're not telling me you belong to any of those tribes. You have relatives that did?

RESPONDENT: No. I belong to the tribes. Meaning, by blood."

Respondent later explained further:

"I am an intertribal Native American. My mother and father have one tribe in common, which is Seminole Creek. My father's side is Choctaw Seminole Creek. My mother's side is Athabascan, which is the Mescalero Apache and also Seminole Creek, so I am more Seminole Creek than I am of the Choctaw and the Apache."

Respondent stated that her mother had her enrollment card, but that since her mother had abandoned her, respondent did not have it; respondent's mother was not enrolled, but respondent's father enrolled her on his side. She confirmed that the authorities would be able to give the tribe her name to verify enrollment, but stated that "[y]ou'll have to go to the Oklahoma side. *** Durant, Oklahoma."

¶ 15                                    III. ICWA Compliance

¶ 16    On April 23, 2013, the parties came before the court for a status hearing on, *inter alia*, compliance with the ICWA. The State was still investigating whether it had taken any action concerning the ICWA earlier in the proceedings, but indicated that "[s]ince the last court date, we've sent notice to all the tribes that [respondent] identified at trial. We've not received anything yet." The court asked which tribes were sent notice, and the prosecutor responded:

"Apache, Choctaw, Seminole Creek, Muscogee, and we've tried Athabascan as well, but it's not–it doesn't seem[ ] to be recognized by the Bureau of Indian Affairs so we also did a notice with tribal affiliation unknown which my understanding is that when we do that, the Bureau of Indian[ ] Affairs checks an individual's–the individual's name that we give for any tribal affiliation et al."

The prosecutor further indicated that the searches were proceeding under the names of respondent and respondent's parents.

¶ 17    At a status hearing on May 15, 2013, the prosecutor indicated that she had reviewed the State's files and had determined that notice was given to several Native American tribes when the case began in 2008, and she presented six exhibits in support. People's group exhibit No. 1 was 18 return receipts from 2008 and was admitted into evidence without objection. People's group exhibit No. 2 was 15 letters to the State's Attorney's office from various tribes in response to the notices sent out by the State in 2008, all of which stated that F.O. was not a member or not eligible for membership, and was admitted into evidence without objection. Respondent's counsel noted for the record that some of the letters had the wrong year of birth for F.O., with the letters stating "11/29/94" as the date of birth instead of 2004, the actual year of F.O.'s birth. People's group exhibit No. 3 was 11 return receipts for notices sent out by the State in 2013 and was admitted without objection. People's group exhibit No. 4 was a letter received by the State's Attorney's office from the Mescalero Apache tribe, dated April 29, 2013, and was admitted without objection. People's group exhibits Nos. 5 and 6 were two envelopes sent to F.O.'s father containing copies of the ICWA notices and were admitted without objection.

¶ 18    People's group exhibit No. 1, as noted, contained 18 return receipts from 2008. The return receipts indicated that the State had sent notices to: (1) the Bureau of Indian Affairs, Choctaw Agency; (2) the Yavapai-Apache Community Council; (3) the Choctaw Nation of Oklahoma; (4) the Tonto Apache Tribal Council; (5) the Mescalero Apache Tribe; (6) the Fort Apache Agency, Bureau of Indian Affairs; (7) the Yavapai/Apache Nation; (8) the Jicarilla Apache Nation; (9) the Apache Tribe of Oklahoma; (10) the Fort Sill Apache Tribe of Oklahoma; (11) the Muscogee (Creek) Nation; (12) the White Mountain Apache Tribal Council; (13) the Mississippi Band of Choctaw Indians; (14) the Jena Band of Choctaw Indians; (15) the Bureau of Indian Affairs, Office of Human Services; and (16), (17), and (18) the Midwest Region Office, Bureau of Indian Affairs.[3]

¶ 19    People's group exhibit No. 2, as noted, contained 15 letters to the State's Attorney's office. A letter dated February 21, 2008, from the Jena Band of Choctaw stated that F.O. and his relatives were not members and were not eligible for membership.

¶ 20    A letter dated March 31, 2008, from the Mescalero Apache Tribe stated that according to its records, respondent was not a member of the tribe. Accordingly, F.O. did not meet the necessary requirements to become eligible for enrollment or to be recognized with the tribe. The letter listed F.O.'s date of birth as "11/24/94."

¶ 21    A letter dated March 31, 2008, from the Jicarilla Apache Nation stated that the nation's record showed a lack of valid proof that there was any association with the nation. Based on that information, F.O. was not eligible for enrollment. The letter listed F.O.'s date of birth as "11/24/94."

¶ 22    A letter dated February 25, 2008, from the Muscogee (Creek) Nation stated that F.O. could not be traced in the nation's tribal records "through the adult relatives listed." Accordingly, F.O. would not be considered an Indian child with relation to the nation. The letter listed F.O.'s date of birth as "11-24-94."

¶ 23    A letter dated February 21, 2008, from the Choctaw Nation of Oklahoma stated that the nation was "unable to establish Indian heritage," so the ICWA did not apply. The letter indicated that "all records are pulled by maiden names and date of birth." The letter further stated that, pursuant to the Constitution of the Choctaw Nation of Oklahoma, "[t]he Choctaw Nation of Oklahoma shall consist of all Choctaw Indians by blood whose names appear on the final rolls of the Choctaw Nation *** and their lineal descendants." The letter listed F.O.'s date of birth as "11-24-94."

¶ 24    A letter dated February 19, 2008, from the White Mountain Apache Tribe stated that neither F.O. nor his parents were enrolled members of the tribe, nor were they eligible to become members of the tribe. The letter listed F.O.'s date of birth as "11/24/1994."

¶ 25    A letter dated February 19, 2008, from the Mississippi Band of Choctaw Indians stated that neither F.O. nor either of his parents was enrolled with the tribe or eligible for enrollment. The letter listed F.O.'s date of birth as "11/24/1994."

¶ 26    A letter dated February 14, 2008, from the Yavapai/Apache Nation stated that F.O.'s parents were not enrolled members of the nation. Accordingly, F.O. was not eligible for enrollment by the nation. The letter listed F.O.'s date of birth as "11/24/94."

---

[3]There were three return receipts with different tracking numbers and different receipt dates, all sent to the same office.

¶ 27    A letter dated February 13, 2008, from the Tonto Apache Tribe stated that F.O. was not enrolled with the tribe, nor was he eligible for enrollment. Additionally, there was no indication of ancestral history with the tribe.

¶ 28    A letter dated April 28, 2008, from the Fort Sill Apache Tribe stated that F.O. was not eligible for tribal membership as "none of the family members whom you identified can be linked to the Fort Sill Apache Tribe." The letter listed F.O.'s date of birth as "11/24/94."

¶ 29    People's group exhibit No. 3, as noted, contained 11 return receipts from 2013. The return receipts indicated that the State had sent notices to: (1) the Apache Tribe of Oklahoma; (2) the Muscogee (Creek) Nation; (3) the Fort Apache Agency, Bureau of Indian Affairs; (4) the Mescalero Apache Tribe; (5) the Fort Sill Apache Tribe of Oklahoma; (6) the Bureau of Indian Affairs, Choctaw Agency; (7) the Choctaw Nation of Oklahoma; (8) the Mississippi Band of Choctaw Indians; (9) the Jena Band of Choctaw Indians; and (10) and (11) respondent.[4]

¶ 30    People's group exhibit No. 4, as noted, consisted of a letter dated April 29, 2013, from the Mescalero Apache Tribe. The letter stated that respondent and respondent's parents were not members of the Mescalero Apache Tribe and, therefore, F.O. did not meet the necessary requirements needed to become eligible for enrollment or recognized as a member of the Mescalero Apache Tribe. The letter also stated that the Mescalero Apache Tribe did not wish to intervene through court proceedings on the matter.

¶ 31    At a July 3, 2013, status hearing, two additional return receipts and a letter were admitted into evidence without objection. However, the State indicated that a recent letter from the Muscogee (Creek) Nation indicated that respondent was eligible for enrollment and F.O. would be considered an Indian child, but due to an incorrect date on the letter, the State had "reached out" to the tribe to clarify the issue.

¶ 32    The return receipts admitted into evidence showed that two notices had been sent to the Bureau of Indian Affairs, Office of Human Services. The letter admitted into evidence was dated May 13, 2013, and was from the Mississippi Band of Choctaw Indians. The letter stated that F.O., respondent, and respondent's parents were not enrolled members of the Mississippi Band of Choctaw Indians and were not eligible for enrollment with the tribe. The letter suggested that "[y]ou may want to check with the Choctaw Nation of Oklahoma."

¶ 33    At a July 11, 2013, status hearing, the State informed the court that it had been in contact with the Muscogee (Creek) Nation and it was the State's position that the ICWA applied. The parties agreed that there was no need to reopen the proofs in the unfitness portion of the termination proceedings and that they would reargue the issue in light of the higher standard of proof required in ICWA cases.

¶ 34    On August 9, 2013, the parties came before the court to reargue the issue of respondent's fitness in light of the ICWA standard. However, the State indicated that since the last court date, there had been additional ICWA developments. The public guardian stated that she had contacted the Muscogee (Creek) Nation, and they reran the records and determined that neither respondent nor F.O. was enrolled or eligible for enrollment with the nation.[5] Three exhibits were entered into evidence.

_____

[4]There were two return receipts with different tracking numbers and different delivery dates, both sent to respondent at the same address.

[5]The record indicates that an individual with the same name as respondent, but a different birthdate, was an enrolled member of the Muscogee (Creek) Nation, leading to the confusion. Once respondent's

¶ 35    First, a letter dated July 3, 2013, from the Muscogee (Creek) Nation stated that F.O. "can be traced within our tribal citizenship enrollment or is eligible for enrollment through the immediate family member [respondent] (bio-mother)." The letter stated that F.O. would be considered an " 'Indian child' " with regard to the Muscogee (Creek) Nation, but that the Muscogee (Creek) Nation would not intervene in the matter.

¶ 36    Next, a letter dated August 8, 2013, from the Muscogee (Creek) Nation stated that based on "additional information recently provided," F.O. "cannot be traced within our tribal records." The letter explained that the "related immediate family members," respondent and F.O.'s father, were not found to be enrolled members. The letter stated that F.O. would not be considered an " 'Indian child[ ]' " in relation to the Muscogee (Creek) Nation and the Muscogee (Creek) Nation was not empowered to intervene in the matter.

¶ 37    Finally, a letter dated July 8, 2013, from the Apache Tribe of Oklahoma stated that F.O.'s name was submitted to the Apache Tribe of Oklahoma enrollment office for confirmation of enrollment or eligibility, and the enrollment office concluded that "the child and members listed on the ancestral chart are not located in the enrollment records." The letter explained that "[i]n order to be eligible for enrollment, a blood quantum of one-eighth (1/8) degree is required. For the child to be eligible, at least one of the great-grandparents must be or must have been enrolled with a blood quantum of four-fourths (4/4) degree." The letter concluded that "[a]dditional notice to the Apache Tribe of Oklahoma Indian Child Welfare [Program] regarding this child will not be necessary."

¶ 38    The matter was continued until August 19, 2013. On that date, respondent's attorney stated that "I have not been able to obtain any information through my conversations that ICWA would apply at this point besides the representations of my client that she has made on the record." The public guardian asked the court whether it would be willing to make a finding that ICWA did not apply, but the court responded that "I'm still not willing to make a finding. I'm not going to put it in order form. I don't do that in any other case, and they're not maintaining that it does. *** So, as I've said on the record, at this point in time based on the information we have, there's no indication that ICWA applies. The Court will use the burden of proof reflected in the Juvenile Court Act in making determinations on this proceeding."

¶ 39    On December 30, 2013, the parties came before the juvenile court for the court's ruling on the unfitness portion of the termination proceedings. The court summarized the history of the proceedings, noting that after testimony had concluded at the termination trial, there was concern as to whether the ICWA applied and "the Court wanted to be clear and give the mother every benefit of the doubt as to whether we could establish her claim to American Indian heritage." After inquiring with respondent and various tribes and waiting for responses, "we were finally at a point where the Court was comfortable saying that appropriate efforts had been made to establish or rule out this case and this child falling under the Indian Child Welfare Act. And we were not able to show that, that it applies."

¶ 40    On March 11, 2014, the juvenile court entered an order finding by clear and convincing evidence that respondent was unfit due to failure to make reasonable progress to correct the conditions that were the basis of the removal during five nine-month periods: July 25, 2008, through April 25, 2009; April 26, 2009, through January 26, 2010; January 26, 2010, through

birthdate was provided, the nation determined that respondent was not an enrolled member of the nation.

September 27, 2010[6]; September 28, 2010, through June 28, 2011; and June 28, 2011, though March 29, 2012. The court further found that it was in F.O.'s best interest to terminate respondent's parental rights. Accordingly, the court ordered the parental rights of respondent terminated. This appeal follows.

ANALYSIS

On appeal, respondent claims that the juvenile court did not properly determine whether F.O. was an Indian child subject to the ICWA and, therefore, the order finding her unfit and terminating her parental rights must be reversed and the cause remanded for a proper ICWA determination.

I. ICWA

Under the ICWA, "[i]n any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner ***." 25 U.S.C. § 1912(a) (2006). " 'Indian child' " is further defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4) (2006).

"While the definition speaks in terms of the child being a 'member' of a tribe or the biological child of a 'member' of a tribe, the absence of evidence of the child's or child's parent's enrollment alone may not be determinative of whether the child or parent is a member of a tribe." *In re T.A.*, 378 Ill. App. 3d 1083, 1089 (2008). "Tribes use a wide range of membership criteria, and some tribes may automatically include a person as a member if the person is a descendant of a tribe member." *In re T.A.*, 378 Ill. App. 3d at 1090. "The party asserting the applicability of the [ICWA] has the burden of producing sufficient evidence for the court to determine if the child is an Indian child." *In re T.A.*, 378 Ill. App. 3d at 1090.

If a child is subject to the ICWA, upon the petition of either parent or the Indian child's tribe, the termination proceeding is to be transferred to the tribal court unless there is good cause to the contrary or the tribe declines jurisdiction. 25 U.S.C. § 1911(b) (2006). Additionally, if a child is subject to the ICWA, "[n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f) (2006). "[I]f a court fails to provide notice as required by section 1912 of the [ICWA], the proper remedy is to reverse the trial court's orders concerning foster care placement or termination of parental rights and begin the proceedings anew in compliance with the requirements of the [ICWA]." *In re K.T.*, 2013 IL App (3d) 120969, ¶ 15.

---

[6]This is actually an eight-month period, not a nine-month period.

¶ 47    Whether the juvenile court was required to give notice to an Indian tribe under the ICWA and the sufficiency of such notice are issues of statutory interpretation, which we review *de novo*. *In re K.T.*, 2013 IL App (3d) 120969, ¶ 9; *In re N.L.*, 2014 IL App (3d) 140172, ¶ 31. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 48                                    II. Notice to Tribes

¶ 49    In the case at bar, respondent argues that the juvenile court did not comply with the ICWA because (1) there was no copy of the notice sent by the State contained in the record on appeal, and (2) there was a "lack of conclusiveness [to] the determination that F.O. was not an Indian child subject to ICWA, especially in the case of Seminole and possibly in the cases of Choctaw and the two Oklahoma Apache tribes as well." We do not find respondent's arguments persuasive.

¶ 50    First, respondent relies on several cases in which courts have found that lack of sufficient documentation in the record led to reversal of the termination proceedings. For instance, in *In re K.T.*, 2013 IL App (3d) 120969, ¶ 14, the Third District Appellate Court, relying on a Michigan Supreme Court case, held that "[i]n order to establish compliance with the [ICWA's] notice provision, trial courts have a duty to ensure that the record includes, at a minimum, (1) the original or a copy of the actual notice sent by registered mail pursuant to section 1912, and (2) the original or a legible copy of the return receipt or other proof of service." See also *In re N.L.*, 2014 IL App (3d) 140172, ¶ 34 (citing *In re K.T.*, 2013 IL App (3d) 120969, ¶ 14). However, in the cases respondent cites, there was no question that the child was an Indian child subject to the ICWA. See *In re K.T.*, 2013 IL App (3d) 120969, ¶ 16 (noting that "there is no dispute that K.T. is an 'Indian child,' " with evidence including a membership card); *In re N.L.*, 2014 IL App (3d) 140172, ¶ 5 (at the dispositional hearing, a social history report was submitted to the juvenile court indicating that the father "is a registered member of the Minnesota Chippewa Tribe, White Earth Reservation").

¶ 51    In the case at bar, however, as respondent's counsel acknowledged before the juvenile court, the only evidence that F.O. might be an Indian child came from respondent's claim of Native American heritage. Our courts have, in the past, concluded that such claims are not necessarily sufficient to trigger the ICWA's notice requirements. *In re C.N.*, 196 Ill. 2d 181, 206 (2001) (concluding that "the brief references in the record to [the father's] unsubstantiated statements concerning his alleged Indian heritage were simply insufficient to implicate the provisions of the ICWA" and that "[t]he circuit court had no reason to believe that C.N. may be an Indian child and no reason to raise the issue"); *In re Anaya J.G.*, 403 Ill. App. 3d 875, 881-82 (2010) (finding that the "bare assertions without any evidence" that the parents had relatives with Indian blood "did not give the circuit court reason to know that Anaya is an Indian child" and accordingly finding that "the circuit court did not err in failing to notify the Cherokee tribe of the proceeding and its right to intervene"); *In re T.A.*, 378 Ill. App. 3d 1083, 1091 (2008) (two DCFS reports that the mother had indicated she was of Native American descent "were insufficient to require the trial court to make a determination on the record whether J.A. was an Indian child," noting that "[n]o evidence or testimony suggests that either [the mother] or J.A. was even eligible for membership").

¶ 52    Furthermore, even if the ICWA's notice requirements were triggered, we cannot find that the absence of the actual notices sent to the tribes establishes a lack of compliance with the

- 10 -

ICWA. As set forth in detail in the facts, the record contains numerous return receipts for the notices sent, as well as the tribes' responses to the State's letters. There is no question that these notices were sent and that the tribes responded; moreover, most of the letters in return reference the information sent to the tribe (for instance, F.O.'s name and date of birth, as well as those of respondent and her parents). On the facts before us, finding that the absence of the initial piece of paper sent to the tribes establishes noncompliance would be exalting form over substance.

¶ 53  We turn, then, to the determination of whether there was noncompliance in the "lack of conclusiveness [to] the determination that F.O. was not an Indian child subject to ICWA, especially in the case of Seminole and possibly in the cases of Choctaw and the two Oklahoma Apache tribes as well." When asked about her tribal affiliations, respondent made two statements to the juvenile court. First, she stated: "As I have told counsel here, Choctaw is Muskogeon. Seminole Creek is Muskogeon. Mescalero Apache is Athabascan." Later, she stated: "I am an intertribal Native American. My mother and father have one tribe in common, which is Seminole Creek. My father's side is Choctaw Seminole Creek. My mother's side is Athabascan, which is the Mescalero Apache and also Seminole Creek, so I am more Seminole Creek than I am of the Choctaw and the Apache."

¶ 54  With regard to the Seminole, we must first address respondent's motion to strike a footnote and the appendix from the State's brief, which we have taken with the case and which concerns the Seminole. Footnote 6 of the State's brief states: "[O]n August 4, 2014, the State's Attorney's Office sent an inquiry to the Seminole Nation of Oklahoma concerning [F.O.] and respondent. In a letter dated August 5, 2014, the Seminole Nation of Oklahoma stated that [F.O.] and his parents are not enrolled members of the Seminole Nation, that [F.O.] will not be considered an Indian child under ICWA, and that the Seminole Nation does not wish to intervene in the state court proceedings. *See* Appendix." The appendix, in turn, contains copies of the correspondence. In her motion, respondent argues that the footnote and the appendix must be stricken, since Illinois Supreme Court Rule 342(a) (eff. Jan. 1, 2005), requires that an appendix include "materials from the record" and the materials in the State's appendix were not even in existence at the time the termination order was entered. We agree with respondent that this information should not have been included in the appendix or in the State's brief, even as a footnote. However, we have not considered it in reaching our decision and therefore deny respondent's motion to strike as moot.

¶ 55  Turning to the merits of respondent's argument concerning the Seminole, respondent admits that she stated that she had "Seminole Creek" heritage and that "Seminole Creek" is not a tribe recognized by the Bureau of Indian Affairs (the BIA). However, she nevertheless claims that notices should have been sent to the Seminole Tribe of Florida and the Seminole Nation of Oklahoma. We do not find this argument persuasive. As the public guardian notes, "[t]he party asserting the applicability of the [ICWA] has the burden of producing sufficient evidence for the court to determine if the child is an Indian child." *In re T.A.*, 378 Ill. App. 3d at 1090. Here, as the party asserting the applicability of the ICWA, respondent had the burden of sufficiently identifying the tribes to which she was claiming affiliation, and she did not identify either the Seminole Tribe of Florida or the Seminole Nation of Oklahoma but instead repeatedly referred to "Seminole Creek." Additionally, the State sent notices to the BIA, as is the proper procedure

when the tribe is not one which is recognized by the BIA.[7] See 25 U.S.C. § 1912(a) (2006) ("If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner ***."). Thus, the State complied with its duties under the ICWA and we find no basis for reversal.

¶ 56 Next, with respect to the Choctaw, respondent claims that the 2008 letter from the Choctaw Nation of Oklahoma gives inaccurate information for F.O., including his date of birth and surname. She acknowledges a 2013 letter from the Mississippi Band of Choctaw Indians, but appears to claim that the lack of a 2013 letter from the Choctaw Nation of Oklahoma requires reversal. We do not find this argument persuasive.

¶ 57 As noted, a letter dated February 21, 2008, from the Choctaw Nation of Oklahoma stated that the nation was "unable to establish Indian heritage," so the ICWA did not apply. The letter indicated that "all records are pulled by maiden names and date of birth."[8] The letter further stated that, pursuant to the Constitution of the Choctaw Nation of Oklahoma, "[t]he Choctaw Nation of Oklahoma shall consist of all Choctaw Indians by blood whose names appear on the final rolls of the Choctaw Nation *** and their lineal descendants." There was a return receipt for a 2013 notice sent to the Choctaw Nation of Oklahoma, but the letter from the nation is not included in the record on appeal. While the 2008 letter listed incorrect information for F.O., the State indicated to the juvenile court that a copy of the termination petition (with the accurate information) was sent along with the notices to the tribes. Thus, the nation had the correct information in its possession. Furthermore, the nation indicated that it is *respondent's* information that is relevant to determining membership and not F.O.'s information (this was also the case for most of the tribes). As explained in its letter, the nation was searching for "Indian heritage" through a search for respondent's maiden name and birth date. There is no indication that respondent's information was incorrect.[9] Thus, there is no basis for reversal with regard to respondent's Choctaw argument. See *In re Trever I.*, 2009 ME 59, ¶ 22 n.5, 973 A.2d 752 (rejecting a similar argument about the absence of the child's birth date from the ICWA notice, noting that "the critical information needed to begin to determine Trever's status as an 'Indian child' is not Trever's birth date but the father's relationship information").

¶ 58 Finally, with respect to the Apache, respondent takes issue with the notification as to the Apache Tribe of Oklahoma and the Fort Sill Apache Tribe of Oklahoma; she does not challenge the notification to the Mescalero Apache Tribe. However, respondent specifically stated that she was Mescalero Apache. Thus, the notification to that tribe was sufficient to comply with the ICWA and notification to the other two tribes was not necessary.

¶ 59 Furthermore, the State contacted both the Apache Tribe of Oklahoma and the Fort Sill Apache Tribe of Oklahoma. A letter dated July 8, 2013, from the Apache Tribe of Oklahoma

---

[7]We also note that on April 23, 2013, the State informed the juvenile court that a notice had been sent to "Seminole Creek." However, no return receipt or letter is included in the record on appeal other than to the Muscogee (Creek) Nation.

[8]It is not entirely clear from the letter whether it is the mother's date of birth or the child's date of birth that is searched for. However, as the search is for lineal descendants of members, the mother's maiden name and her date of birth would make the most sense.

[9]While respondent claims that the nation's response "does not mention" her, again, the State indicated that it sent the termination petition along with the notice. Thus, the nation would have had respondent's information from both the notice and the petition.

stated that F.O.'s name was submitted to the Apache Tribe of Oklahoma enrollment office for confirmation of enrollment or eligibility, and the enrollment office concluded that "the child and members listed on the ancestral chart are not located in the enrollment records." The letter explained that "[i]n order to be eligible for enrollment, a blood quantum of one-eighth (1/8) degree is required. For the child to be eligible, at least one of the great-grandparents must be or must have been enrolled with a blood quantum of four-fourths (4/4) degree." The letter concluded that "[a]dditional notice to the Apache Tribe of Oklahoma Indian Child Welfare [Program] regarding this child will not be necessary." Respondent acknowledges this letter but claims that "if [F.O.] is 1/8 Oklahoma Apache (with a great-grandparent enrolled), he is eligible. The possibility of eligibility does not appear to be foreclosed based on this letter." However, respondent never claimed that F.O. had a great-grandparent enrolled in the Apache Tribe of Oklahoma and does not do so on appeal. Accordingly, we do not find this argument persuasive.

¶ 60   Additionally, a letter dated April 28, 2008, from the Fort Sill Apache Tribe stated that F.O. was not eligible for tribal membership as "none of the family members whom you identified can be linked to the Fort Sill Apache Tribe." There was a return receipt for a 2013 notice sent to the tribe, but the letter from the tribe is not included in the record on appeal. Respondent's arguments concerning the 2008 letter are identical to the arguments she makes with respect to the Choctaw, and we similarly find them unpersuasive.

¶ 61                                   CONCLUSION

¶ 62   For the reasons set forth above, we find that the juvenile court did not err in determining that F.O. was not an Indian child subject to the ICWA.

¶ 63   Affirmed.