2025 IL App (1st) 242325

No. 1-24-2325 (cons. w/1-24-2343)

Filed September 24, 2025

Third Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* A.M., | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois |
| Minor-Appellee, | ) | Juvenile Justice and Child Protection |
| | ) | Department, Child Protection |
| (The People of the State of Illinois, | ) | Division. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 21 JA 418 |
| v. | ) | |
| | ) | |
| Victor M. and Fawn S., | ) | |
| | ) | Honorable Diane Pezanoski, |
| Respondents-Appellants). | ) | Judge, Presiding. |

PRESIDING JUSTICE MARTIN delivered the judgment of the court, with opinion.
Justices Rochford and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1     Respondents Fawn S. (Fawn) and Victor M. (Victor) are the biological parents of A.M., a

minor. A.M. is an "Indian" child under the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C.

§ 1901 *et seq.* (2024)), as she is a member of, or is eligible for membership in, the Lac Courte

Oreilles Band of Lake Superior Chippewa Indians (Tribe).[1] See *id.* § 1903(4). In this case, we consider whether compliance with the qualified expert witness (QEW) provision of the ICWA is required prior to any foster care placement. See *id.* § 1912(e), (f).

¶ 2                                    I. BACKGROUND

¶ 3        A.M. was born August 7, 2020, prenatally exposed to a controlled substance (cocaine). On April 29, 2021, the State filed a petition for adjudication of wardship and motion for temporary custody, alleging that A.M. was neglected pursuant to the Juvenile Court Act of 1987. 705 ILCS 405/2-3(1)(b), (2)(ii) (West 2020). Specifically, the State noted that Fawn had four prior indicated reports for various head injuries, cuts, bruises, welts, abrasions, oral injuries, and a substantial risk of physical injury to A.M.'s siblings. Fawn is the mother of five other children who are not in her care—two are in the custody of others and three were removed by the Department of Children and Family Services (DCFS) after a court found them to be abused and neglected. Fawn was previously diagnosed with post-traumatic stress, bipolar, and multiple personality disorders. Victor, A.M.'s father, was previously diagnosed with bipolar disorder. There is a history of domestic violence between Fawn and Victor, and the petition noted that shortly after A.M.'s birth, her parents were involved in a physical altercation in her presence.

¶ 4        Based on the facts alleged in the petition, the circuit court held a temporary custody hearing on April 30, 2021, at which Victor notified the court that A.M. qualified as a child of Indigenous standing pursuant to the ICWA. The court entered an order—containing ICWA specific language—granting DCFS temporary custody and allowing supervised visits for both of A.M.'s

---

[1]Moving forward, except when referencing an official title, we opt to follow the preference of Native Peoples, as acknowledged by the United Nations, and use the term "Indigenous," rather than "Indian." See Elizabeth Prine Pauls, *Tribal Nomenclature: American Indian, Native American, and First Nation*, Britannica, https://www.britannica.com/topic/Tribal-Nomenclature-American-Indian-Native-American-and-First-Nation-1386025 (last visited Sept. 17, 2025) [https://perma.cc/5N26-LKVJ].

parents. A finding on Victor's paternity was entered on June 23, 2021. The court entered an order on September 15, 2021, finding that A.M. is a member of, or eligible for membership in, the Tribe. Two months later, an attorney representing the Tribe filed an appearance, but the Tribe did not claim jurisdiction over A.M.

¶ 5    In April of 2022, the court granted both parents unsupervised day visits, to occur at the office of Lawrence Hall, a community-based service agency. In July, the court granted an unsupervised visit outside of the office, for A.M.'s birthday.

¶ 6    The court held an adjudication hearing on September 22, 2022. A stipulation of facts was entered into the record. Fawn admitted to having six children, two of whom were under guardianship of a family friend and two who were adopted through DCFS proceedings. Fawn and Victor were no longer in a relationship, but she would watch A.M. while he was at work. Fawn was recommended for several services (including individual therapy, a psychiatric evaluation, substance abuse assessment, and domestic violence services), but she had not completed any of the recommended services and did not have unsupervised visitation with any of her children. Victor completed parole on July 22, 2020, and he completed a 30-hour inpatient substance abuse program while on parole. The court entered an order the same day, finding A.M. to be abused (injurious environment), by clear and convincing evidence.

¶ 7    A virtual dispositional hearing was held by Zoom on October 31, 2022. All parties were present. The court heard testimony from Tibissum Rice, a member of the Tribe and the Director of Indian Welfare and Family Services for the Tribe. After Rice detailed her qualifications, the State requested the court find Rice qualified as an expert witness. Upon no objection to the request, the court found Rice was a QEW for purposes of the ICWA.

¶ 8        Rice prepared for the hearing by reviewing the petition for adjudication, the court reports, the case workers' records, and the stipulation of facts entered at the adjudication hearing. Rice stated that if A.M. had remained in her father's custody, she would likely suffer serious physical or emotional damage. In support of this assertion, Rice noted Fawn's prior involvement with DCFS and the ongoing domestic violence concerns between Fawn and Victor.

¶ 9        Danielle Guzick, program manager for Lawrence Hall, is the case manager for A.M. Guzick had visited A.M. at her foster home and had no concerns regarding her placement. Fawn had been assessed for services through an integrated assessment and was found to be in need of individual therapy, a substance abuse evaluation, domestic violence services, a psychiatric evaluation, the Nurturing Parenting Program (NPP), and parent coaching. Fawn completed the psychiatric evaluation and received a diagnosis of attention-deficit/hyperactivity disorder (ADHD). She also completed domestic violence services, the NPP, a substance abuse assessment, individual therapy, and an outpatient drug treatment program (although she was still testing positive for marijuana). Guzick noted that the agency has visitation concerns regarding discipline (including Fawn admitting there was an incident where she smacked A.M. on the hand), equal parenting style, and the parents' understanding of A.M.'s emotional and developmental needs. Victor was also assessed for services, and several were recommended: substance abuse assessment, psychiatric evaluation, individual therapy, domestic violence, the NPP, and parent coaching. He completed the psychiatric evaluation (diagnosed with adjustment disorder), the NPP, the substance abuse evaluation (recommended for outpatient treatment), and drug screening (routinely tests positive for marijuana). Victor was engaged in domestic violence services and individual therapy, although he had missed several sessions, and the agency was recommending parent coaching.

¶ 10　　　　A.M.'s parents had unsupervised visitation with A.M. until there was an incident in August 2022—when the case aide brought A.M. to her parents' apartment for a visit and there was a bong present on the kitchen countertop, within A.M.'s reach. This caused the agency to again require supervised visitation, pending completion of the agency's recommendations of completed substance abuse evaluation and enrollment in child-parent psychotherapy. Ultimately, Guzick recommended that A.M. be made a ward of the court, as she believed it was in A.M.'s best interest.

¶ 11　　　　Fawn's therapist, Marie Gandy, testified that Fawn is always on time or early for each of her weekly therapy sessions. Fawn had challenges processing previous traumatic experiences and her prior DCFS cases but had been more open recently. Gandy attested that Fawn has made great progress working with her.

¶ 12　　　　Following the closing arguments, the court found the State had met its burden by clear and convincing evidence, including the testimony of the QEW, that A.M. was likely to suffer serious emotional or physical damage if she remained in the parents' custody. It noted that active efforts were made in the case and that there was good cause found to deviate from the ICWA placement requirements. The court adjudged A.M. a ward of the court, finding the parents to be unable, for some reason other than financial circumstances alone, to care for, protect, train, or discipline A.M. The court held a permanency hearing on the same date and issued an order setting a permanency goal for A.M. to return home within five months. The order noted that DCFS had made active efforts but that those "Active Efforts of the agency or its assigns are ongoing and have not yet been successful in attaining the return of the minor to the parent *** and continued removal is necessary to avoid serious physical and/or emotional damage or harm to the minor."

¶ 13　　　　On May 26, 2023, the court changed A.M.'s permanency goal to return home within 12 months, finding that the parents had made *some* progress toward return home.

¶ 14        Following motions from the father and mother for A.M.'s return home, the court held a hearing on April 2, 2024. Guzick testified that both parents were compliant with reunification services and had made progress. At the close of hearing, the court granted the parents' motions, finding they "have been very compliant with their services and have made significant progress, great progress on their services." Further, finding that the agency made active efforts and A.M. was unlikely to suffer harm, the court returned A.M. to the care and custody of her parents, incorporating a section 2-24 (*id.* § 2-24) order of protection.

¶ 15        In July, the State filed a motion to violate and vacate the order of protection. At a July 12, 2024, hearing, the State noted that the parties had agreed that A.M. could remain in the care of Victor, as long as Fawn entered a 28-day residential treatment program. The State further noted that DCFS would pay for A.M.'s daycare program, so Victor's work schedule could be accommodated. The court entered both an order modifying the dispositional order to reflect that Fawn was unable to care, train, or protect A.M. and a corresponding amended section 2-24 order of protection. A separate visitation order noted that, at a minimum, visits between A.M. and her mother should be supervised until Fawn entered a residential treatment program.

¶ 16        Months later, the guardian *ad litem* (GAL) filed a motion to violate and vacate the order of protection, due to allegations of corporal punishment and Fawn violating the visitation order. At a hearing on October 22, 2024, the GAL entered three exhibits into evidence: an October 5, 2024, parent coaching termination report, and the court's July 12, 2024, orders. Guzick was the only witness to testify. She testified that then four-year-old A.M. had been in a safety plan with a relative caregiver since a planned sibling visit on September 27, 2024. On September 30, 2024, Guzick was notified that a DCFS hotline call had been made stating that Fawn and Victor were hitting A.M., that Fawn had kicked her, and that Victor had kicked her in the back. Following this call,

Guzick met with A.M. on October 1, 8, and 11. On the last of these meetings, A.M. reported that her "mean mommy" hits her when she is in trouble. A.M. further stated that she fears her and that her "mean mommy" locks her in her bedroom at night, despite the fact that she is scared and there are monsters under her bed. Upon further questioning, A.M. informed Guzick that she is in her bedroom until the morning when her mother lets her out to get ready for school; only her father takes her to school. When Guzick asked A.M. if she is hit every time she "gets in trouble," A.M. responded affirmatively. Following this conversation, Guzick texted A.M.'s parents and informed them that she did not have any updates, that the investigation was still pending, and that "someone would reach out to them" regarding the investigation.

¶ 17    Guzick additionally spoke with Victor's parenting coach twice after the hotline call. During her conversation, the coach informed Guzick that she was terminating Victor's parent coaching because she was concerned about A.M.'s safety in the home. The coach had previously informed Guzick that she believed she had overheard Fawn in Victor's home when she was not supposed to be there. Additional reasons for terminating the parenting sessions involved the coach believing Victor was no longer making progress, it was difficult to contact him, he was not scheduling the parent coaching sessions, and his focus seemed to have shifted from A.M. to concern for Fawn. Guzick noted that A.M.'s guardian took her for a physical on October 8 and A.M. received four shots she was "behind on." Additionally, some bruising was noticed on A.M.'s shin. Despite the fact that A.M.'s parents had scheduled appointments to take A.M. to a physical exam, they had not taken A.M. to a doctor since she had returned to their care.

¶ 18    Fawn had failed to participate in an inpatient treatment program but sent Guzick a certificate for an intensive outpatient drug treatment program, with a completion date of October 21, 2024. Guzick testified that she had continued to request random urine screens from Fawn, and

that in June 2024, Fawn tested positive for cocaine, opiates, and cannabis. In August, she twice tested positive for cocaine and cannabis, and in September, she tested positive for cannabis and opiates. As for Victor's urine screens, he had only ever tested positive for cannabis.

¶ 19    Following Guzick's testimony, the State asked the court to take judicial notice of Tibissum Rice's October 31, 2022, QEW testimony. The attorneys for the parents objected and questioned what the State was attempting to demonstrate with the testimony. The State responded that when entering disposition orders, QEW testimony is needed, and the Tribe indicated "that judicial notice of prior testimony is appropriate." While the mother's attorney agreed with the Tribe's assessment, he objected based on the fact that he did not know the substance of the testimony. The court reserved its ruling on the QEW notice issue, and the State continued with cross-examination of Guzick.

¶ 20    Guzick explained that Fawn had entered an outpatient treatment instead of inpatient because when the treatment provider asked Fawn what her "drug of choice" was, Fawn denied that she used cocaine and claimed to only use cannabis. Fawn's therapist informed Guzick that she was recommending Fawn complete a psychological evaluation. Further, Guzick noted there was a second investigation called into the DCFS hotline in June 2024, by "somebody in the community" who observed Fawn hitting A.M. at a store. Guzick explained Fawn was indicated at the completion of that investigation. Guzick had concerns that the parents' housing is unstable due to their representations that they are behind on their rent by five or six thousand dollars. Since A.M. has been removed from her parents' care and custody, they have neither called A.M. nor have they inquired about A.M.'s status. A.M.'s current caregiver is a person of Indigenous standing. When Guzick discussed A.M.'s parents with A.M., she stated she did not want to see them and was scared. Later, A.M. told Guzick that she only wanted to see her parents if Guzick was present.

¶ 21    The State then asked the court to take judicial notice of the October 31, 2022, disposition order, in lieu of taking judicial notice of Rice's QEW testimony. No party objected to this request, and the court granted it.

¶ 22    On further cross-examination, Guzick agreed that Fawn had completed 75 hours of an intensive outpatient treatment program. Regarding her previous urine screens, Fawn explained that she tested positive for opiates in June due to a cough medicine and in September due to "some type of tea." Guzick observed visits between A.M. and her mother and noted the interactions were often "transactional." A.M. began to struggle with sleeping following her return home to her parents and would sometimes sleep in the living room or their room. Her parents added string lights and a night light to address the sleep issues. When questioned regarding the current plan to work towards reunification of A.M. and her mother, Guzick answered that Fawn would continue with urine screens (and any recommendations arising therefrom), a psychological evaluation, individual therapy, and parent coaching. To Guzick's knowledge, no one had contacted Victor since A.M. was removed. Guzick clarified that the parents were informed they were not allowed to contact A.M., and she would not have expected them to call A.M. while she was in the safety plan home. Guzick conceded that Victor had informed her he was struggling and could use more help as a single parent.

¶ 23    During closing arguments, the mother's counsel stated that it was premature to vacate and violate the order of protection where there was no QEW testimony, as required under section 1912(e) of the ICWA. The attorney for the Tribe stated that the Tribe believes the parents are in violation of the order of protection and that QEW testimony was unneeded, since Rice testified in October 2022. Noting that the parents could always put on their own QEW testimony, counsel for the tribe noted that he did not think QEW testimony was "absolutely necessary" at this hearing.

Counsel offered to share his list of QEWs that the Tribe typically uses and reminded the court that the QEW burden is on the State, not the Tribe. The GAL countered that Rice's earlier QEW testimony satisfied the ICWA, since the court was operating under the original dispositional proceeding.

¶ 24    The court entered a modified dispositional order on October 22, 2024, finding that both parents had violated the order of protection and were unable to care, train, or protect A.M. The order adjudged A.M. a ward of the court and noted that the agency has made active efforts, which "are ongoing and have not yet been successful in attaining the return of the minor to the parent." Both parents thereafter timely filed notices of appeal.

¶ 25    We note that this appeal was accelerated pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Pursuant to that rule, the appellate court must, except for good cause shown, issue its decision in an accelerated case within 150 days of the filing of the notice of appeal. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Here, both Victor M. (case 1-24-2343) and Fawn S. (case 1-24-2325) filed their respective notices of appeal on November 20, 2024. Thus, our disposition was due on April 21, 2025. See Ill. S. Ct. R. 311(a)(4), (5) (eff. July 1, 2018). On December 30, 2024, this court consolidated the two appeals. Thereafter, counsels for Victor and Fawn each filed two motions requesting extensions to file the opening brief. Thereafter, on March 7, 2025, Victor's counsel filed an amended opening brief. On April 9, 2025, Fawn's counsel filed an opening brief. Following three extension requests, the appellees' briefs were filed on June 18 and 24, 2025, and the case became ready on July 21, 2025. We find these reasons to constitute good cause for this decision to issue after the timeframe mandated in Rule 311(a).

¶ 26                                II. ANALYSIS

¶ 27    On appeal, A.M.'s father argues that the circuit court erred in ruling that (1) DCFS made

active efforts to prevent the breakup of a family with Indigenous standing, as required by the ICWA (25 U.S.C. § 1912(d)), where it conflated post-removal reunification efforts with pre-removal preventative efforts and failed to provide a detailed basis for its finding applying the heightened ICWA standard, and (2) the GAL and State proved by clear and convincing evidence, as required under the ICWA (*id.* § 1912(f)), that continued custody of the child by the parent was likely to result in serious emotional or physical damage when it did not have new QEW testimony. A.M.'s mother contends the trial court violated the family's rights under the ICWA by removing A.M. without (1) clear and convincing evidence that removal was necessary, (2) QEW testimony that removal was necessary, and (3) requiring evidence that DCFS made active efforts to prevent removal.

¶ 28                                    A. ICWA

¶ 29         The ICWA "determines jurisdiction over [Indigenous child] custody proceedings." *In re M.H.*, 2011 IL App (1st) 110196, ¶ 54 (citing *In re C.N.*, 196 Ill. 2d 181, 203 (2001)). It establishes minimum federal standards that must be met before an Indigenous child is removed from their family through state court proceedings. *In re C.N.*, 196 Ill. 2d at 203. A child of Indigenous standing is defined as "any unmarried person who is under age eighteen and is either (a) a member of an [Indigenous] tribe or (b) is eligible for membership in an [Indigenous] tribe and is the biological child of a member of an [Indigenous] tribe." 25 U.S.C. § 1903.

¶ 30         Congress enacted the ICWA in 1978 "in response to the growing concern over the consequences to [children of Indigenous standing], families and tribes of abusive welfare practices which separated large numbers of [children of Indigenous standing] from their families and tribes through adoption or foster care placement, usually in [non-indigenous] homes." *In re C.N.*, 196 Ill. 2d at 203 (citing *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989)).

The ICWA aspires "to promote the stability and security of [Indigenous] tribes and families by the establishment of minimum Federal standards for the removal of [Indigenous] children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of [Indigenous] culture." 25 U.S.C. § 1902 (West 2024).

¶ 31    Furthermore, "[t]he Act contains a powerful enforcement provision, which allows any parent or [Indigenous] custodian from whose custody an [Indigenous] child was removed to petition the court to invalidate the foster care placement *** if the court violated any provisions included in section 1911, 1912, or 1913." *In re K.T.*, 2013 IL App (3d) 120969, ¶ 15; 25 U.S.C. § 1914 (2012); *In re H.S.*, 2016 IL App (1st) 161589, ¶ 39 ("[a] violation of sections 1911 or 1912 of the ICWA may be cause to invalidate a state child custody proceeding").

¶ 32                                B. QEW

¶ 33    We first address the QEW issue raised by the parents, as we believe that issue is dispositive. Both parents argue that the trial court's October 22, 2024, dispositional order should be reversed, where the trial court violated section 1912(e) of the ICWA by removing A.M. from her home without QEW testimony. The GAL concedes that the lack of QEW testimony requires a remand to the trial court to obtain testimony from a QEW. Nonetheless, they argue, the proffered evidence was sufficient to show that the father's continued custody would result in serious emotional or physical damage. The State likewise acknowledges that the trial court was required to hear from a QEW prior to any foster care placement of A.M. and agrees that the case should be remanded for compliance with the ICWA QEW requirements. While the parties are in agreement that the cause should be remanded for QEW testimony, the issue presented is apparently one of first impression in Illinois. Moreover, there is some disagreement between the parties as to whether the cause should be remanded solely for QEW testimony, or if a new dispositional hearing is required.

¶ 34    To the extent that Fawn challenges the October 31, 2022, dispositional order, we decline to address her belief that Rice's testimony was not "proper QEW testimony," where the deadline to complain of such errors has long passed. See *In re Leona W.*, 228 Ill. 2d 439, 456-57 (2008) (noting that an appeal of a dispositional order must be filed within 30 days from the entry of the final judgment).

¶ 35    Because A.M. is a child of Indigenous standing, the parties agree that the ICWA applies. The relevant facts of this case are undisputed, and resolution of this issue requires us to interpret section 1912 of the ICWA. 25 U.S.C. § 1912(e), (f) (West 2024). We review issues of statutory construction *de novo*. *In re K.T.*, 2013 IL App (3d) 120969, ¶ 9. Likewise, "[w]hether the trial court properly applied ICWA to the facts of a case is reviewed *de novo*." *In re Cal. E.*, 2023 IL App (4th) 220930, ¶ 134 (citing *In re M.H.*, 2011 IL App (1st) 110196, ¶ 64). *De novo* review means that the reviewing court performs the same analysis a trial judge would perform. *In re F.O.*, 2014 IL App (1st) 140954, ¶ 47.

¶ 36    When we interpret a statute, our primary objective is to ascertain and give effect to the legislature's intent. *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 11. Intent is best determined by reviewing "the statutory language, given its plain and ordinary meaning." *Id.* "Where the language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction." *Id.*

¶ 37    Pursuant to the plain language of section 1912 of the ICWA,

> "[n]o foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, *including testimony of qualified expert witnesses*, that the continued custody of the child by the parent or [custodian of Indigenous standing] is likely to result in serious emotional or physical

damage to the child." (Emphasis added.) 25 U.S.C. § 1912(e).

¶ 38     Section 1903 of the ICWA defines "foster care placement" to mean:

"any action removing [a child of Indigenous standing] from its parent or [custodian of indigenous standing] for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or [custodian of Indigenous standing] cannot have the child returned upon demand, but where parental rights have not been terminated." *Id.* § 1903(1)(i).

¶ 39     Clearly, based upon the plain language of the statute, ICWA rules for foster care placement applied at the time that A.M., a child of Indigenous standing, was removed from her father's home following the October 2024 dispositional hearing. A trial court may not order an Indigenous child's placement in foster care until it first determines that clear and convincing evidence, *including testimony from an ICWA qualified expert witness*, demonstrates "that the continued custody of the child *** is likely to result in serious emotional or physical damage to the child." *Id.* § 1912(e). While "[t]he ICWA does not define 'qualified expert witness' " (*In re D.D. Jr.*, 385 Ill. App. 3d 1053, 1060 (2008)), nonbinding guidelines enacted to assist state courts in their application of the ICWA delineate the following explanation for who may serve as a qualified expert witness:

"(a) A qualified expert witness should have specific knowledge of the Indian tribe's culture and customs.

(b) Persons with the following characteristics, in descending order, are presumed to meet the requirements for a qualified expert witness:

(1) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

(2) A member of another tribe who is recognized to be a qualified expert witness by the Indian child's tribe based on their knowledge of the delivery of child and family services to Indians and the Indian child's tribe.

(3) A layperson who is recognized by the Indian child's tribe as having substantial experience in the delivery of child and family services to Indians, and knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

(4) A professional person having substantial education and experience in the area of his or her specialty who can demonstrate knowledge of the prevailing social and cultural standards and childrearing practices within the Indian child's tribe." Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10146-02, 10157 (Feb. 25, 2015) (updating original guidelines, Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67584-01, 67593 (Nov. 26, 1979)).

¶ 40    Furthermore, binding guidelines direct that:

"(a) A qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe. A person may be designated by the Indian child's Tribe as being qualified to testify to the prevailing social and cultural standards of the Indian child's Tribe.

(b) The court or any party may request the assistance of the Indian child's Tribe or the BIA office serving the Indian child's Tribe in locating persons qualified to serve as expert witnesses.

(c) The social worker regularly assigned to the Indian child may not serve as a qualified expert witness in child-custody proceedings concerning the child." 25 C.F.R. § 23.122 (2025).

¶ 41    We conclude that the record of the 2024 proceedings in the instant case does not contain testimony of a QEW as required in section 1912(e) of the ICWA. While a court is not required to base its finding *solely* on QEW testimony, such testimony must at least partially support the court's findings. *In re B.V.*, 2025 ND 28, ¶ 23, 17 N.W.3d 549, 556 (citing *In re K.B.*, 2021 ND 106, ¶ 10, 961 N.W.2d 293, 297). Rather than present a QEW witness in compliance with the above guidelines, the State urged the court to take judicial notice of Rice's two-year old QEW testimony. This is improper and clearly not compliant with the ICWA's regulations.

¶ 42    While this court is not bound by decisions from other jurisdictions (*In re M.H.*, 2011 IL App (1st) 110196, ¶ 58), those decisions can be persuasive. See, *e.g.*, *In re Cari B.*, 327 Ill. App. 3d 743, 750 (2002) (finding a decision of the Alaska supreme court to be persuasive). Here, we find *In re E.G.M.*, 750 S.E.2d 857 (N.C. Ct. App. 2013) instructive. In *In re E.G.M.*, the court examined the requirements for foster care placement under the ICWA. *Id.* at 863. The North Carolina court determined that "the district court's transfer of legal custody from respondent-mother to DSS [Division of Social Services] while leaving Ellen in kinship care constituted a foster care placement subject to the requirements of 25 U.S.C. § 1912(e)." *Id.* As in this case, a QEW provided testimony at the child's initial dispositional hearing but did not testify at any subsequent hearing. Nonetheless, the court relied on the initial QEW testimony in issuing subsequent orders. The appellees argued that section 1912(e) does not require that an "expert testify contemporaneously to the court's decision to order a foster care placement, merely that such testimony be presented." *Id.* The North Carolina court noted that it found no case law from other

jurisdictions interpreting this specific aspect of section 1912(e)'s application. *Id.* The court held that "a determination under 25 U.S.C. § 1912(e) must be supported by evidence, including expert testimony, *introduced at the proceeding that results in the foster care placement.*" (Emphasis added.) *Id.* at 864. Accordingly, because the QEW did not testify at the permanency planning hearing, the court vacated the order awarding legal custody of the minor to DSS and remanded the cause for further proceedings consistent with the ICWA. *Id.* at 865.

¶ 43        As in the case cited above, we note that no QEW offered testimony at the October 22, 2024, dispositional hearing. Where section 1912(e) of the ICWA was plainly violated, we reverse the court's October 22, 2024, order. See *In re H.S.*, 2016 IL App (1st) 161589, ¶ 39 ("[a] violation of sections 1911 or 1912 of the ICWA may be cause to invalidate a state child custody proceeding").

¶ 44        Given the "remedial purpose of the [ICWA], it should be given a liberal interpretation." *In re Cari B.*, 327 Ill. App. 3d at 750. With that interpretation in mind, we hold that when a trial court removes a child of Indigenous standing without hearing testimony from a QEW witness, the proper remedy is to reverse the trial court's order concerning foster care placement and hold a new hearing in compliance with the ICWA requirements. *Cf. In re F.O.*, 2014 IL App (1st) 140954, ¶ 46 (holding that when a court "fails to provide notice as required by section 1912 of the [ICWA], the proper remedy is to reverse the trial court's orders concerning foster care placement or termination of parental rights and begin the proceedings anew in compliance with the requirements of the [ICWA]" (internal quotation marks omitted)); *cf. In re K.T.*, 2013 IL App (3d) 120969, ¶ 15 (collecting cases where the court held the proper remedy for failure to comply with section 1912's notice requirement is to reverse the case and "begin the proceedings anew in compliance with the requirements").

¶ 45        The final issue raised on appeal is whether the State presented sufficient evidence to

establish compliance with the active efforts requirement of section 1912(d). Where we have already found that section 1912(e) of the ICWA was plainly violated, and that remand for a new dispositional hearing is appropriate, we need not consider this argument. *Cf. Van Heerden v. Van Heerden*, 321 S.W.3d 869, 875 (Tex. App. 2010) (noting that "[t]he circumstances surrounding the parent-child relationship may have changed since the trial court's original judgment, which would require a factfinder to assess the new situation").

¶ 46                                III. CONCLUSION

¶ 47        Based on the foregoing reasons, we reverse the trial court's October 22, 2024, dispositional order and remand for a new ICWA-compliant dispositional hearing.

¶ 48        Reversed and remanded with directions.

---

**In re A.M., 2025 IL App (1st) 242325**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-JA-418; the Hon. Diane Pezanoski, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Gillian Fealy, of Chicago, for appellant Victor M. |
| | Sharone R. Mitchell Jr., Public Defender, of Chicago (Benjamin Ginzky and Samuel M. Hayman, Assistant Public Defenders, of counsel), for other appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (Enrique Abraham and Gina DiVito, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, Carrie Fung, and Juliane Johnson, of counsel), other for appellee. |